UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                    :
REGINALD POWE and COLLEEN JONES,                    :
                                                    :
                Plaintiff,                          :       08-CV-1963 (JGK)
                                                    :
        v.                                          :       ECF Case
                                                    :
CAMBIUM LEARNING, INC.,                             :
                                                    :
                Defendant.                          :
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - x


## REPLY DECLARATION OF MARSHALL R. KING IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

I, Marshall R. King, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am an attorney admitted to practice in this Court and a partner in the law firm Gibson, Dunn & Crutcher LLP, counsel for Cambium Learning, Inc., the defendant in this action. I submit this declaration in support of Cambium's Motion to Dismiss the Complaint.

2.      Attached hereto as Exhibit A is a true and correct copy of the Agreement of Purchase and Sale of Assets between Cambium Learning, Inc. and Metropolitan Teaching & Learning Co., Inc., dated October 28, 2003.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 15th day of May, 2008.

_____
Marshall R. King

Exhibit A

*EXECUTION COPY*

AGREEMENT OF PURCHASE AND SALE OF ASSETS

by and among

CAMBIUM LEARNING (NEW YORK), INC.

CAMBIUM LEARNING, INC.

DIALOGUE SYSTEMS, INC.

AMERICAN TEACHER PUBLICATIONS, INC.

METROPOLITAN T.L.C. HOLDINGS, INC.

and

METROPOLITAN TEACHING & LEARNING CO., INC.

October 28, 2003

TABLE OF CONTENTS

Page

1. Purchase and Sale of Assets ........................................................................... 3
   1.1. Acquired Assets ..................................................................................... 3
   1.2. Excluded Assets ..................................................................................... 4
   1.3. Purchase Price ....................................................................................... 5
   1.4. Net Inventory Adjustment ..................................................................... 6
   1.5. Related Agreements ............................................................................... 7
   1.6. Closing Date .......................................................................................... 8

2. Liabilities of the Business .............................................................................. 8
   2.1. Liabilities Assumed by Buyer ............................................................... 8
   2.2. Liabilities Not Assumed by Buyer ........................................................ 8

3. Allocation of Purchase Price .......................................................................... 9

4. Representations and Warranties of the Company and the Parent ................... 9
   4.1. Organization and Qualification ............................................................. 9
   4.2. Authority .............................................................................................. 10
   4.3. Financial Condition ............................................................................. 10
      4.3.1. Financial Statements ................................................................ 10
      4.3.2. Absence of Certain Changes .................................................... 11
      4.3.3. Indebtedness ............................................................................ 12
   4.4. Tax Matters ......................................................................................... 12
      4.4.1. Tax Returns; Disputes ............................................................. 12
      4.4.2. Section 168 .............................................................................. 12
      4.4.3. FIRPTA .................................................................................... 12
      4.4.4. Tax Definitions ........................................................................ 12
   4.5. Litigation and Claims .......................................................................... 13
      4.5.1. Litigation Pending or Threatened ............................................ 13
      4.5.2. Business Enjoined .................................................................... 13
      4.5.3. Violation of Law; Permits ........................................................ 13
   4.6. Properties and Assets of the Company ................................................. 13

Page

4.6.1.  Title to Real Property ........................................................13

4.6.1.1.  Assessments.......................................................14

4.6.1.2.  Property Leases....................................................14

4.6.1.3.  No Breach or Event of Default; Property Leases .................14

4.6.1.4.  Violation of Law...................................................14

4.6.1.5.  Location............................................................14

4.6.2.  Intellectual Property ...............................................15

4.7.  Insurance ......................................................................18

4.8.  Labor and Employment Matters..............................................19

4.8.1.  Labor and Employment Definitions ...............................19

4.8.2.  Employee Benefit Plans ............................................19

4.8.3.  Benefit Obligations ..................................................22

4.8.4.  Performance..........................................................22

4.8.5.  Compensation........................................................22

4.8.6.  Resignations .........................................................22

4.8.7.  Collective Bargaining Agreements ................................22

4.8.8.  Obligation to Employ ...............................................23

4.9.  Compensation of and Indebtedness to and from Employees and the Parent ............23

4.9.1.  Key Employee Compensation ....................................23

4.9.2.  Indebtedness.........................................................23

4.10.  Contract and Other Instruments ...........................................24

4.10.1.  Contracts...........................................................24

4.11.  Environmental Liability .....................................................24

4.11.1.  Hazardous Materials .............................................24

4.11.2.  Environmental Requirements ...................................24

4.11.3.  Notice of Violations ..............................................25

4.11.4.  Potentially Responsible Party ...................................25

4.11.5.  Environmental Reports ..........................................25

4.11.6.  Asbestos...........................................................25

4.11.7.  Definitions.........................................................25

4.12.  Agreement Not in Breach of Other Instruments .........................26

4.13.  Regulatory Approvals........................................................27

Page

4.14. Inventories ................................................................................27

4.15. Disclosure ................................................................................28

4.16. Brokerage ................................................................................28

4.17. Bank Accounts ..........................................................................28

4.18. Ownership of Capital Stock ........................................................28

4.19. Customers ................................................................................29

4.20. Suppliers ..................................................................................29

5. Representations and Warranties of the Buyer ........................................29

5.1. Organization ..............................................................................29

5.2. Authority ...................................................................................29

5.3. Capitalization; the Shares ............................................................29

5.4. No Violations, Consents ..............................................................30

5.5. Legal Proceedings ......................................................................30

6. Non-Compete and Solicitation .............................................................30

7. Company and Parent Closing Deliveries ................................................31

7.1. Permits, Approvals and Authorizations ..........................................31

7.2. No Challenge or Violation of Orders .............................................31

7.3. Certain Documents .....................................................................31

7.4. Opinion of Counsel to the Company and the Parent .......................33

7.5. FIRPTA Affidavit ........................................................................33

7.6. Performance by the Company and the Parent ...............................33

7.7. Revised Author Agreements ........................................................33

8. Buyer's Closing Deliveries ..................................................................33

8.1. Permits, Approvals and Authorizations ..........................................33

8.2. No Challenge or Violation of Orders .............................................33

8.3. Certain Documents .....................................................................34

8.4. Delivery of the Purchase Price .....................................................34

9. Covenants of the Company and the Parent ...........................................35

9.1. Cooperation ..............................................................................35

9.2. Further Assurances ....................................................................35

80270310_11 (4).DOC

Page

9.3  Company Health Plan .................................................................................................36

10.  Indemnification .........................................................................................................36

    10.1.  Indemnification of the Buyer ...............................................................................36

        10.1.1.  Limitations on Liability .............................................................................37

    10.2.  Survival ...............................................................................................................37

        10.2.1.  General Claims .........................................................................................37

        10.2.2.  Claims Barred Only by the Applicable Statute of Limitations ...............37

        10.2.3.  Health Plan ...............................................................................................37

    10.3.  Defense by the Indemnifying Party ......................................................................37

    10.4.  Notice ..................................................................................................................38

    10.5.  Waiver .................................................................................................................38

    10.6.  Indemnification Escrow Amount .........................................................................38

11.  Miscellaneous Provisions .........................................................................................39

    11.1.  Jurisdiction; Agent for Service ...........................................................................39

    11.2.  Construction ........................................................................................................39

    11.3.  Notices ................................................................................................................39

    11.4.  Payment of Expenses ..........................................................................................41

    11.5.  Assignment .........................................................................................................41

    11.6.  Amendments and Waiver ....................................................................................41

    11.7.  Survival ...............................................................................................................41

    11.8.  Counterparts ........................................................................................................41

    11.9.  Headings ..............................................................................................................42

    11.10.  Attorneys' Fees .................................................................................................42

    11.11.  Binding Nature of Agreement ...........................................................................42

    11.12.  Severability .......................................................................................................42

    11.13.  Specific Performance .........................................................................................42

    11.14.  Complete Agreement .........................................................................................42

    11.15.  Knowledge of the Company ..............................................................................43

11.16.  Drafting Presumption .........................................................................................43

## List of Exhibits

| | |
|---|---|
| Exhibit 1.3(a) | Stockholders Agreement |
| Exhibit 1.3(c) | Escrow Agreement |
| Exhibit 1.5(a) | Contract Assignment |
| Exhibit 1.5(b) | Lease Assignment |
| Exhibit 1.5(c) | Form of Bill of Sale |
| Exhibit 1.5(e) | Employment Agreements |
| Exhibit 7.4 | Opinion of Counsel to the Company and the Parent |
| Exhibit 7.7(a)(i) | Authors Whose Agreements Require Addenda |
| Exhibit 7.7(a)(ii) | Author Addendum |
| Exhibit 7.7(b) | AAS Addendum |
| Exhibit 7.7(c) | Work for Hire Acknowledgement |

## List of Schedules

| | |
|---|---|
| Schedule 1.1 | Acquired Assets |
| Schedule 1.2 | Excluded Assets |
| Schedule 1.3(b) | Additional Payees |
| Schedule 2.1(a) | Capital Lease Obligations |
| Schedule 2.1(b) | Current Liabilities |
| Schedule 3(a) | Allocation of Purchase Price Among Parties |
| Schedule 3(b) | Allocation of Purchase Price Among Assets and Liabilities |
| Schedule 4.1 | Non-qualified Jurisdictions |
| Schedule 4.3.2 | Certain Changes |
| Schedule 4.3.1 | Financial Statements |
| Schedule 4.3.3 | Indebtedness |
| Schedule 4.4.1 | Tax Matters |
| Schedule 4.5.1 | Litigation |
| Schedule 4.5.3 | Licenses, Permits and Authorizations |
| Schedule 4.6 | Right to Assets |
| Schedule 4.6.1(a) | Real Property |
| Schedule 4.6.1(c) | Non-office Uses |
| Schedule 4.6.1.3 | Property Leases |
| Schedule 4.6.2-1 | Intellectual Property in Published Materials |
| Schedule 4.6.2-2 | Intellectual Property in Unpublished Materials |
| Schedule 4.6.2-3 | Contracts with Creators/Owners Requiring Royalty Payments |
| Schedule 4.6.2-4 | Contracts with Owners of Other Intellectual Property |
| Schedule 4.6.2-5 | Intellectual Property; Patent and Trademark Registrations |
| Schedule 4.6.2-6 | Intellectual Property; Outgoing Licenses |
| Schedule 4.6.2-7 | Intellectual Property; Litigation |
| Schedule 4.6.2-8 | Intellectual Property; Invalid Contracts |
| Schedule 4.6.2(c) | Licenses for Which Consents to Assignment must be Obtained |
| Schedule 4.6.2(d) | Author Agreements with Reversion Rights |
| Schedule 4.7 | Insurance |
| Schedule 4.8.2(a) | Employee Benefit Plans |

| | |
|---|---|
| Schedule 4.8.2(e) | Employee Benefit Plan Actions |
| Schedule 4.8.3 | Benefit Obligations |
| Schedule 4.8.6 | Resignations |
| Schedule 4.9.1 | Key Employee Compensation |
| Schedule 4.9.2 | Debt Owed to Employees |
| Schedule 4.10.1 | Contracts |
| Schedule 4.12 | Breached Agreements |
| Schedule 4.17 | Bank Accounts |
| Schedule 4.18 | Capitalization |
| Schedule 4.19 | Customers |
| Schedule 4.20 | Suppliers |

# DEFINED TERMS

| Term | Defined in: |
| --- | --- |
| Acquired Assets | Section 1.1 |
| AEC | Recitals |
| Affiliate | Section 6 |
| Agreement | Preamble |
| American | Preamble |
| AMI | Recitals |
| Assignment of Trademark | Section 1.5(d) |
| Assumed Liabilities | Section 2.1 |
| Authors | Section 7.7(a) |
| Author Payment | Section 1.3(b) |
| Available Excess | Section 10.6 |
| Balance Sheet | Section 4.3.1(a) |
| Berkery | Recitals |
| Bill of Sale | Section 1.5(c) |
| BOCNY | Recitals |
| Business | Recitals |
| Buyer | Preamble |
| Cambium | Preamble |
| Chua Amount | Section 1.3(b) |
| Collateral Agent | Section 1.3(a) |
| Closing | Section 1.6 |
| Closing Cash Payment | Section 1.3(b) |
| Closing Date | Section 1.6 |
| Closing Net Inventory | Section 1.4(a) |
| Code | Section 4.4.2 |
| Company | Preamble |
| Contract Assignment | Section 1.5(a) |
| Contracts | Section 1.1(e) |
| Copyright Assignments | Section 1.5(d) |
| Customer | Section 6 |
| Deficit Amount | Section 1.4(d) |
| Dialogue | Preamble |
| EdNewco | Recitals |
| Employee Benefit Plan | Section 4.8.1 |
| Employee List | Section 4.9.1 |
| Employment Agreements | Section 1.5(e) |
| Environmental Damages | Section 4.11.7 |
| Environmental Requirements | Section 4.11.7 |
| Equity Payment | Section 1.3(a) |
| ERISA | Section 4.8.1 |
| ERISA Affiliate | Section 4.8.1 |

| Term | Defined in: |
| --- | --- |
| ERISA Plan | Section 4.8.1 |
| Escrow Agent | Section 1.3(c) |
| Escrow Agreement | Section 1.3(c) |
| Escrow Amount | Section 1.3(c) |
| Estimated Net Inventory | Section 1.4(a) |
| Excluded Assets | Section 1.2 |
| Excluded Liabilities | Section 2.2 |
| Financial Statements | Section 4.3.1(a) |
| Former Real Property | Section 4.11.7 |
| Fourth-Priority Creditors | Recitals |
| Fraud Claim | Section 10.2.2 |
| Fraudulent Transfer Law | Section 4.12(c) |
| GAAP | Section 4.3.1(b) |
| Governmental Authority | Section 4.11.7 |
| Hazardous Materials | Section 4.11.7 |
| Health Plan | Section 9.3 |
| Independent Accountants | Section 1.4(c) |
| Intellectual Property | Section 4.6.2(a) |
| Intercreditor Agreement | Recitals |
| Interim Balance Sheet | Section 4.3.1(a) |
| Inventories | Section 1.1(c) |
| IRS | Section 4.8.2(d) |
| Balance Sheet Date | Section 4.3.1(a) |
| Lease Assignment | Section 1.5(b) |
| Leased Property | Section 4.6.1(a) |
| Mesbic | Recitals |
| Metro | Preamble |
| Mezzanine Lenders | Recitals |
| Multiemployer Plan | Section 4.8.1 |
| Murray Amount | Section 1.3(b) |
| Notice of Disagreement | Section 1.4(c) |
| Other Intellectual Property | Section 4.6.2(a) |
| Owned Intellectual Property | Section 4.6.2(a) |
| Parent | Preamble |
| Pension Plan | Section 4.8.1 |
| Permits | Section 1.1(f) |
| Person | Section 4.6.2(f) |
| Personal Property | Section 1.1(a) |
| Platform Learning Purchase Order | Section 10.1 |
| Powe | Recitals |
| Proper Authority Claim | Section 10.2.2 |
| Property Leases | Section 4.6.1.2 |
| Public Software | Section 4.6.2(i) |
| Purchase Price | Section 1.3(c) |
| Real Property | Section 4.6.1(a) |

| Term | Defined in: |
| --- | --- |
| Related Agreements | Section 1.5 |
| Rho | Recitals |
| SBP | Recitals |
| Secured Creditors | Recitals |
| Shares | Section 1.3(a) |
| Stonehenge | Recitals |
| Surplus Amount | Section 1.4(d) |
| Tannenbaum | Recitals |
| Tax Claim | Section 10.2.2 |
| tax return | Section 4.4.4 |
| taxes | Section 4.4.4 |
| Third-Priority Creditors | Recitals |
| Unsecured Creditors | Recitals |
| Welfare Plan | Section 4.8.1 |

80270310_11 (4).DOC

# AGREEMENT OF PURCHASE AND SALE OF ASSETS

This AGREEMENT OF PURCHASE AND SALE OF ASSETS (this "Agreement") is made as of October 28, 2003 by and among Cambium Learning (New York), Inc., a Delaware corporation (the "Buyer"), Cambium Learning, Inc., a Delaware corporation ("Cambium"), Metropolitan Teaching & Learning Co., Inc., a New York corporation (the "Metro"), Dialogue Systems, Inc., a New York corporation ("Dialogue"), American Teacher Publications, Inc., a New York corporation ("American" and together with Metro and Dialogue, the "Company") and Metropolitan T.L.C. Holdings, Inc., a New York corporation (the "Parent").

## RECITALS

A.    The Company, located in New York, New York, conducts the business of publishing supplemental and other educational materials for grade-school children (kindergarten through 12th grade) (the "Business") and the Company owns certain assets used in the conduct and operation of the Business.

B.    The Parent and the Company desire to discontinue their operation of the Business, and pursuant to such end, desire to sell substantially all of the assets of the Business and assign certain leases and other rights and obligations in connection with the Business, and the Buyer desires to purchase such assets and assume such leases, rights and obligations.

C.    On December 4, 2002, the Company hired Berkery, Noyes & Co. ("Berkery") as its financial adviser. Berkery has marketed the Company to fifteen potential acquirers over the last nineteen months. During this period, the Company has been engaged in serious negotiations with three of the potential fifteen buyers. None of these negotiations with potential buyers yielded a final bid.

D.    A combination of the Parent and the Company have issued four classes of secured debt and other unsecured debt (excluding trade payables and the like), as follows:

(1)    Pursuant to a Senior Secured Note dated February 28, 2002 and made by each of the Parent, Metro, Dialogue and American in favor of Stonehenge Capital Fund New York, LLC ("Stonehenge"), and a related security agreement, Stonehenge has a first-priority lien on the assets of the Company. As of October 23, 2003, the amount owed under this note and the related purchase agreement, security agreement and other documents to Stonehenge, including accrued but unpaid interest, equals approximately $305,400.

(2)    Pursuant to Senior Subordinated Notes dated June 8, 2001 and made by each of the Parent, Metro, Dialogue and American in favor of, in order of the outstanding principal balances of the notes, Stonehenge, Alliance Mezzanine Investors, L.P. ("AMI"), Alliance Enterprise Corporation ("AEC") and BOCNY, LLC ("BOCNY", and collectively with Stonehenge, AMI and AEC, the "Mezzanine Lenders") and a related

security agreement, the Mezzanine Lenders have a second-priority lien on the assets of the Company. As of October 23, 2003, the amount owed under the notes and the related purchase agreement, security agreement and other documents to the Mezzanine Lenders, including accrued but unpaid interest, equals $6,273,985.97.

(3)     Pursuant to Subordinated Promissory Notes dated April 30, 2003 and made by the Parent in favor of, in order of the outstanding principal balances of the notes, MESBIC Ventures, Inc. ("Mesbic"), Reginald Powe ("Powe") and AEC (AEC, Mesbic and Powe are collectively referred to as the "Third-Priority Creditors") and a related security agreement, the Third-Priority Creditors have a third-priority lien on the assets of the Company. As of October 23, 2003, the amount owed under the notes and the related purchase agreement, security agreement and other documents to the Third-Priority Creditors, including accrued but unpaid interest, equals $1,453,438.52.

(4)     Pursuant to Junior Convertible Subordinated Debentures dated April 29, 2002 (first tranche) and November 13, 2002 (second tranche) and made by the Parent in favor of, in order of the outstanding principal balances of the notes, Rho Management Trust I ("Rho"), Mesbic, SB Partners Capital Fund, L.P. ("SBP"), Tannenbaum Helpern & Hirschtritt Associates, LLC ("Tannenbaum", and together with Rho, Mesbic and SBP, the "Fourth-Priority Creditors") and New York City Investment Fund, LLC (which has since canceled the notes made in its favor) and a related security agreement, the Fourth-Priority Creditors have a fourth-priority lien on the assets of the Company. As of October 23, 2003, the amount owed under the notes and the related purchase agreement, security agreement and other documents to the Fourth-Priority Creditors, including accrued but unpaid interest, equals $4,017,140.02.

(5)     As of the date hereof, the Company owes Rho an unsecured debt for loaned money of approximately $404,252, Carl Fischer an unsecured debt for loaned money of $51,842 and Jon Newcomb an unsecured debt for loaned money of $51,951 (the "Unsecured Creditors").

E.     Stonehenge (as first-priority creditor) and each of the Mezzanine Lenders, Third-Priority Creditors and Fourth Priority Creditors (collectively, the "Secured Creditors") are party to that certain Amended and Restated Intercreditor Agreement, dated as of April 30, 2003 (the "Intercreditor Agreement"), which provides for, among other things, (i) the priority of payment among the Secured Creditors, (ii) the release of collateral by all Secured Creditors to the extent funds are applied in the manner set forth in the Intercreditor Agreement and (iii) a power of attorney in favor of Stonehenge to sign all required release documentation.

F.     The Purchase Price, as defined below and as may be adjusted from time to time pursuant to the terms of this Agreement, will be applied to repay Stonehenge in full, as first priority lender, under its Senior Secured Note, and the balance will be used to repay some, but

not all, of the amount owed to the Mezzanine Lenders. The Third-Priority Creditors, the Fourth-Priority Creditors and the Unsecured Creditors, as such holders, will not receive any of the Purchase Price on the payment of their respective debts.

G.    All holders of the Secured Debt have consented to the release of the collateral in connection with the transactions contemplated by this Agreement.

H.    The Buyer is a wholly owned subsidiary of Cambium.

I.    Cambium is a wholly owned subsidiary of EdNewco, LLC, a Delaware limited liability company ("EdNewco").

AGREEMENT

In consideration of the foregoing and the mutual covenants contained in this Agreement and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Buyer, the Company and the Parent hereby agree as follows:

1.    Purchase and Sale of Assets.

1.1.    Acquired Assets. On the Closing Date the Company and the Parent agree to sell and deliver to the Buyer against the consideration described in Section 1.3 and Section 2.1, all of the assets and properties of every kind owned or used by the Company in the conduct of the Business or otherwise owned or used in the conduct of the Business (except for those Excluded Assets listed in Section 1.2), including, without limitation, the following assets (such assets and properties of the Company are collectively referred to hereinafter as the "Acquired Assets"):

(a)    all fixtures, vehicles, machinery, equipment, rolling stock, tools, furniture, pallets, phones, office supplies and other items of personal property, whether or not recorded on the books of the Company (collectively, the "Personal Property");

(b)    all of the Company's right, title and interest in and to all Leased Property (as defined in Section 4.6.1), except for the lease for the apartment located at 7 East 14th Street Apt. 403, New York, New York, 10003;

(c)    all inventories, including publishing, advertising and marketing materials and other materials, equipment, supplies and other similar items as of the Closing Date (collectively, the "Inventories");

(d)    the Intellectual Property used in the Business, including but not limited to all Intellectual Property listed on Schedules 4.6.2-1 through 4.6.2-6;

(e)    all contracts of the Business (including the Property Leases, purchase orders and supply agreements) that are listed on Schedule 4.10.1 and, in Buyer's discretion, any contract of the Business not listed on Schedule 4.10.1 that Buyer

3

determines to assume within a reasonable time after Buyer becomes aware of such contract (the "Contracts");

        (f)     the federal, state, local and foreign licenses, permits, certificates of occupancy or use and other governmental approvals or authorizations held by the Company on the Closing Date (collectively, "Permits") listed on Schedule 4.5.3 to the extent that they are assignable without violating applicable law;

        (g)     the amount of prepaid deposits and prepaid expenses made by the Company as of the Closing Date for all Contracts or Permits or otherwise relating to the Acquired Assets or the operation of the Business;

        (h)     all rights and claims against third parties in respect of the Acquired Assets or the operation of the Business, including, without limitation, all rights under express or implied warranties from suppliers to the Company and all other claims, rebates, payments from vendors and refunds;

        (i)     all computer equipment, computer software and software licenses owned or held by the Company or which the Company has the right to use to the extent assignable to the Buyer;

        (j)     all cash, cash equivalents, petty cash, deposit accounts, checks received by the Company upon which collection has not been made, and all accounts, notes and contracts receivable relating to the Business as of the Closing Date;

        (k)     all other assets and properties owned by the Company as of the Closing Date whether tangible or intangible, real or personal; and

        (l)     all those assets specifically listed on Schedule 1.1 hereto.

        1.2.    Excluded Assets. Notwithstanding anything contained in Section 1.1 hereof to the contrary, the Parent and the Company are not selling, and the Buyer is not purchasing, any of the following assets owned by the Company, all of which shall be retained by the Company (collectively, the "Excluded Assets"):

        (a)     The Company's minute books, seals, stock record books, stock certificates and other similar corporate documents that are not necessary for the Buyer to operate the Business, and returns of taxes, including all supporting schedules, attachments, work papers and similar documents, for taxes accruing on or before the Closing Date, provided that upon request the Buyer may have copies thereof;

        (b)     Any long and short term securities owned by the Company as of the Closing Date;

        (c)     Any counterclaim relating to the litigation subject to Section 2.2(d);

(d)      the rights that accrue or will accrue to the Company under this Agreement;

(e)      the attorney-client privilege between the Company and its legal counsel; and

(f)      Each of the assets listed on Schedule 1.2 hereto.

1.3.      Purchase Price.  As consideration for the Acquired Assets, on the Closing Date the Buyer shall:

(a)      deliver to or at the direction of BOCNY as collateral agent for the Company's secured lenders (the "Collateral Agent"), stock certificates for 146,907 shares of the Series A Convertible Preferred Stock of Cambium (the "Shares") representing 3% of the fully diluted ownership position in Cambium immediately after giving effect to the transactions contemplated by this Agreement but prior to giving effect to any subsequent issuances or purchases of Cambium's securities together with a Stockholders Agreement in the form attached as Exhibit 1.3(a) (the "Equity Payment");

(b)      pay and deliver to or at the direction of the Collateral Agent by wire transfer of immediately available funds, the aggregate amount of $3,765,628 *less* the Escrow Amount and *less* any amount payable to the Authors (the "Author Payment") as a result of amendments contemplated by Section 7.7 of this Agreement and *less* any amount payable to Kathy Murray (the "Murray Amount") and Dennis Chua (the "Chua Amount") arising out of their severance agreements as set forth on Schedule 1.3(b) and *less* any additional amounts payable by the Buyer on behalf of the Company at Closing to the third parties listed on Schedule 1.3(b) (such resulting amount, the "Closing Cash Payment");

(c)      pay and deliver to The Bank of New York, as escrow agent (the "Escrow Agent"), by wire transfer of immediately available funds, $1,137,500 (the "Escrow Amount"), to be held in escrow and distributed in accordance with the terms of the escrow agreement attached hereto as Exhibit 1.3(c) (the "Escrow Agreement").  As set forth in the Escrow Agreement, the Escrow Amount shall be used to support any net Inventory adjustments that may be owing from the Parent and the Company to the Buyer under Section 1.4(a) below and any indemnification claims of the Buyer arising under Section 10.6.  The Escrow Amount shall be held, invested and distributed in accordance with the terms of the Escrow Agreement.  The Escrow Amount, together with the Equity Payment and the Closing Cash Payment, are sometimes referred to collectively herein as the "Purchase Price";

(d)      pay and deliver to each of the Authors, their respective portion of the Author Payment, if any, by wire transfer of immediately available funds to the accounts specified by such Authors; and

(e)      pay and deliver the amounts set forth on Schedule 1.3(b) to the persons listed on Schedule 1.3(b), including, without limitation, the Murray Payment to

Kathy Murray and the Chua Payment to Dennis Chua by check or wire transfer of immediately available funds, as specified on Schedule 1.3(b).

1.4.    Net Inventory Adjustment.

(a)    As soon as reasonably practicable following the Closing Date, and in any event within 60 calendar days thereafter, the Buyer shall prepare and deliver to the Parent a calculation of the net Inventory (as defined below) of the Company as of immediately prior to the Closing (the "Closing Net Inventory"). The "Closing Net Inventory" shall equal the Inventory of the Company *less* any Inventory reserve, as of immediately prior to the Closing and calculated in each case in a manner consistent with industry practice. For purposes of this Agreement, the estimated net Inventory as of immediately prior to the Closing is $1,251,741 (the "Estimated Net Inventory").

(b)    The Closing Net Inventory shall be calculated by the Buyer and a copy of the calculation thereof shall be delivered by the Buyer to the Parent as soon as practicable following the Closing Date, but not later than 60 days thereafter. Representatives of the Company shall have the right to participate with the representatives of the Buyer in the process of calculating Closing Net Inventory and shall have access to all data, schedules and work papers used by the Buyer in connection therewith.

(c)    The calculation of Closing Net Inventory shall become final and binding upon the parties on the 10th calendar day following receipt thereof by the Parent unless the Parent delivers written notice of its disagreement ("Notice of Disagreement") to the Buyer prior to such date. Any Notice of Disagreement shall specify the amounts with which the Parent disagrees. If a Notice of Disagreement is sent by the Parent, then the Closing Net Inventory (as recalculated in accordance with clause (x) or (y) below) shall become final and binding upon the parties on the earlier of (x) the date the parties hereto resolve in writing any differences they have with respect to any matter specified in the Notice of Disagreement or (y) the date any disputed amounts are finally determined in accordance with the balance of this paragraph. During the 20-day period following the delivery of a Notice of Disagreement, the Parent and Buyer shall seek in good faith to resolve in writing any differences which they may have with respect to any amount specified in the Notice of Disagreement or identified by the Buyer during said 20-day period. If, at the end of such 20-day period, the Parent and the Buyer have not reached agreement on such amounts, the amounts which remain in dispute shall be recalculated by an accounting firm mutually agreed upon by the Parent and the Buyer (the "Independent Accountants"). The Independent Accountants shall make a ratable allocation of its charges for such work as a part of its determination, based on the proportion by which the amount in dispute was determined in favor of one party or the other. Any amounts so recalculated shall be final and binding on the parties.

(d)    If the Closing Net Inventory is less than the amount of the Estimated Net Inventory, (such difference, the "Deficit Amount"), then within three days after final determination of such amount the Escrow Agent shall pay to the Buyer out of the Escrow Amount an amount equal to the Deficit Amount and any earnings thereon. If,

on the other hand, the Closing Net Inventory is greater than the amount of the Estimated Net Inventory (such difference, the "Surplus Amount"), then within three days after the final determination of such amount the Buyer shall pay and deliver to or at the direction of the Collateral Agent by wire transfer of immediately available funds an amount equal to the Surplus Amount.

      1.5.   Related Agreements. On or prior to the Closing Date the respective parties referred to below will take the following actions:

      (a)   The Company and the Buyer shall enter into an Assignment and Assumption Agreement substantially in the form attached hereto as Exhibit 1.5(a) (the "Contract Assignment") providing for the transfer all of the Contracts other than the Property Leases subject to Exhibit 1.5(b).

      (b)   The Company, Parent and the Buyer will enter into an agreement or agreements for the assignment by the Company to the Buyer of all of the Company's right, title and interest in and to the Leased Property acquired pursuant to Section 1.1(b), substantially in the form attached hereto as Exhibit 1.5(b) ("Lease Assignment").

      (c)   A bill of sale and assignment (the "Bill of Sale") covering the items of personal property included in the Acquired Assets.

      (d)   The Company will deliver to the Buyer such transfers of copyright by each of Parent, Metro, American and Dialogue (collectively, the "Copyright Assignments"), an assignment of trademarks executed by Metro (the "Assignment of Trademark"), and such other instruments as the Buyer may deem necessary in order to effect the transfer and assignment to the Buyer of all Intellectual Property and rights therein owned by the Company. After the Closing, the Company will execute and deliver to the Buyer such confirmatory documents as the Buyer may request for the purpose of perfecting the Buyer's right in Owned Intellectual Property and/or the assignment and registration of Intellectual Property being acquired hereunder by the Buyer.

      (e)   The Buyer and each of Powe and Colleen Jones shall enter into an employment agreement (the "Employment Agreements") substantially in the form attached hereto as Exhibit 1.5(e).

      (f)   The Company, BOCNY and the Escrow Agent shall enter into the Escrow Agreement.

      (g)   All of the Parent's shareholders shall execute and deliver written consents to the transactions contemplated by this Agreement or such lessor amount of consents as Buyer, in its sole discretion, deems adequate.

      The documents referred to in this Section 1.5 shall be collectively referred to herein as the "Related Agreements."

1.6.    <u>Closing Date</u>.  The closing (the "<u>Closing</u>") of the purchase and sale of the Acquired Assets shall be held at 10:00 a.m. Eastern time on October 28, 2003 or on any other date or time as is mutually agreed by the parties hereto (such date and time being referred to herein as the "<u>Closing Date</u>"), at the offices of Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, New York.

2.    <u>Liabilities of the Business</u>.

2.1.    <u>Liabilities Assumed by Buyer</u>.  As further consideration for consummation of the transactions contemplated hereby, the Buyer, without further action by any party, hereby assumes as of the Closing Date the following liabilities (the "<u>Assumed Liabilities</u>"):

(a)    all capital lease obligations set forth on Schedule 2.1(a) hereto underlying the fixed assets of the Company that constitute Acquired Assets;

(b)    all current liabilities of the Company set forth on Schedule 2.1(b), which shall not include the current portion of long-term debt and any short-term debt of the Company;

(c)    all trade payables and accruals of the Company existing on the Closing Date as set forth on Schedule 2.1(b);

(d)    all obligations of the Company under the Contracts that constitute Acquired Assets; and

(e)    any accrued but unused vacation time of employees of the Company.

2.2.    <u>Liabilities Not Assumed by Buyer</u>.  Except for the Assumed Liabilities, the Buyer is not assuming any debts, obligations or liabilities of the Company or the Parent whatsoever, whether known or unknown, actual or contingent, matured or unmatured, currently existing or arising in the future, including but not limited to the liabilities set forth below (the "<u>Excluded Liabilities</u>"), which shall remain the responsibility of the Company and the Parent (whether or not the Buyer is alleged to have liability as a successor to the Company):

(a)    the fees and expenses of legal counsel, auditors and accountants retained or employed by the Company or the Parent for services rendered in connection with the preparation, negotiation, execution, delivery and performance of this Agreement and the transactions contemplated hereby;

(b)    any liability asserted against the Buyer the existence of which indicates a material breach of any covenant, agreement, representation or warranty of the Company or the Parent contained in this Agreement;

(c)    any liability of the Company or the Parent for Taxes (as hereinafter defined) which (i) arise, are assessed or become payable or due as of or prior to the Closing Date or (ii) arise out of the consummation of the transactions contemplated hereby or (iii) are payable by the Company as a result of purchases, sales or transfers as

8

of or prior to the Closing Date, or (iv) other taxes of any kind or description, except current real estate and personal property taxes with respect to the Acquired Assets to the extent such taxes relate to periods subsequent to the Closing Date;

(d)    any liability or obligation (contingent or otherwise) of the Company arising out of any pending or threatened litigation;

(e)    any liability or obligation for Environmental Damages;

(f)    any of the following obligations to the extent not expressly assumed by the Buyer under Section 2.1: (i) for borrowed money, (ii) evidenced by notes, bonds, debentures or similar instruments, (iii) for the deferred purchase price of goods or services, (iv) under capital or operating leases or (v) guarantees of any of the obligations described in clauses (i) through (iv);

(g)    any other event or circumstance, the occurrence of which would give rise to a claim by the Buyer for indemnification under Section 10;

(h)    subject to Section 9.3, any liability or expense, except to the extent such liability or expense is expressly assumed by the Buyer in this Section 2.1(e), with respect to or arising out of (i) any Employee Benefit Plan, (ii) the employment or termination of employment of any employee of the Company or an ERISA Affiliate, or (iii) any severance agreements or arrangements between the Company or the Parent and their respective employees; whether by contract or pursuant to Company policies; and

(i)    all payables by the Company to Artech Printing Inc.

3.    Allocation of Purchase Price.  The parties agree that the amount of the Purchase Price (including the fair market value of the Equity Payment) shall be allocated among Parent, Metro, American and Dialogue in accordance with Schedule 3(a). The amount allocated to each of Parent, Metro, American and Dialogue, together with the Assumed Liabilities of such corporation that are liabilities for federal income tax purposes, shall be allocated for federal income tax purposes among the Acquired Assets of such corporation in accordance with Schedule 3(b).  The parties agree to amend Schedules 3(a) and 3(b) to reflect any adjustments to the Purchase Price hereunder.  Subject to the requirements of applicable law, such allocation (as so amended) shall be binding upon the parties for the purposes of filing any return, report or schedule regarding taxes.

4.    Representations and Warranties of the Company and the Parent.  The Company and the Parent, jointly and severally, represent and warrant to the Buyer, as of the date hereof and as of the Closing, as follows:

4.1.    Organization and Qualification.  Each of the Company and the Parent is duly formed and validly existing as a corporation in good standing under the laws of the State of New York and has all corporate power and authority to own or lease and operate its properties and assets and to carry on its business in the manner in which such business is now being conducted. Except as set forth on Schedule 4.1, each of the Company and the Parent is duly qualified to do business as a foreign corporation and is in good standing in every jurisdiction in

9

which the nature of the business conducted by it or the character or location of the properties owned or leased by it makes such qualification necessary except where the failure to be so qualified, whether singly or in the aggregate, would not reasonably be expected to have a material adverse effect on the Company. Neither the Parent nor the Company owns, beneficially or otherwise, directly or indirectly, any capital stock or other securities or other ownership interest of any Person.

4.2.   <u>Authority</u>. Each of the Company and the Parent has full power and authority to enter into this Agreement and to consummate the transactions contemplated hereby. This Agreement and all other agreements to be executed in connection herewith by the Company and the Parent have been duly executed and delivered by the Company and the Parent, have been duly authorized by all necessary corporate action by the Company and the Parent (including, without limitation, any required authorization by the board of directors and shareholders of the Company and the Parent) and constitute legal, valid and binding obligations of the Company and the Parent enforceable in accordance with their respective terms subject to applicable bankruptcy, insolvency, reorganization, moratorium, marshaling, fraudulent conveyance and other laws affecting rights of creditors, debtors or equity holders generally.

4.3.   <u>Financial Condition</u>.

4.3.1.   <u>Financial Statements</u>.

(a)   Set forth on Schedule 4.3.1 are copies of the following (collectively, the "<u>Financial Statements</u>"): (i) the unaudited financial statements of the Company for the fiscal years ended December 31, 2002 and December 31, 2001 and the audited financial statements of the Company for the fiscal year ended December 31, 2000, including balance sheets as at December 31, 2002, December 31, 2001 and December 31, 2000 (the "<u>Balance Sheet</u>" and December 31, 2002, the "<u>Last Balance Sheet Date</u>"); (ii) the related statements of income and of changes in financial position for the fiscal years then ended; (iii) the unaudited interim financial statements of the Company for the eight month period ended August 31, 2003, including a balance sheet as at August 31, 2003 (the "<u>Interim Balance Sheet</u>"); and (iv) the related statements of income and of changes in financial position for the eight month period then ended.

(b)   Except as set forth on Schedule 4.3.1(b), the Financial Statements: (i) are correct and complete in all material respects and have been prepared in accordance with the books and records of the Company; (ii) have been prepared in accordance with United States generally accepted accounting principles ("<u>GAAP</u>") consistently applied throughout the periods covered; (iii) reflect and provide reserves in respect of all known liabilities of the Company which in the opinion of the Company are adequate, including all known contingent liabilities, as of their respective dates; and (iv) present fairly the consolidated financial condition of the Company at such date and the results of its operations for the fiscal period then ended.

(c)   The Company (i) keeps books, records and accounts that, in reasonable detail, accurately and fairly reflect (A) the transactions and dispositions of assets of the Company and (B) the value of inventory calculated in accordance with

10

GAAP. Neither the Parent, the Company nor any employee, agent or shareholder of the Parent or the Company, directly or indirectly has made any payment of funds of any such entity or received or retained any funds in violation of any applicable law, rule or regulation.

       4.3.2.  <u>Absence of Certain Changes</u>.  Except as set forth on Schedule 4.3.2, since the Last Balance Sheet Date, each of the Company and the Parent has used commercially reasonable efforts to preserve the business organization of the Company intact, to keep available to the Company the services of all current officers and employees necessary to the Business and to preserve the goodwill of the customers and employees having business relations with the Company.  Since the Last Balance Sheet Date, the Company has conducted its business in the ordinary course, has maintained its assets and properties in at least as good order and condition as existed on the Last Balance Sheet Date (other than wear as may be accounted for by reasonable use) and as is necessary to continue to conduct its business.  Except as set forth on Schedule 4.3.2, since the Last Balance Sheet Date there has not been:

       (a)     any transaction by the Company not in the ordinary and usual course of business;

       (b)     any damage, destruction or loss, whether or not covered by insurance, affecting the Acquired Assets or the Business;

       (c)     any material alteration in the manner in which the Company keeps its books, accounts or records, or in the accounting principles and practices therein reflected;

       (d)     a termination or threatened termination or substantial modification of the Company's relationship with a material customer (other than jobs completed in the ordinary course of business) or supplier or adverse event affecting any product or process used by the Company;

       (e)     a lease of, or commitment to acquire or lease, any realty or any substantial item of machinery or equipment that would constitute an Acquired Asset;

       (f)     any mortgage, pledge or lien, charge or other encumbrance placed upon any of the assets or properties of the Company;

       (g)     sale, assignment or transfer of any asset, property or business or cancellation of any debt or claim or waiver of any right, except in the ordinary course of business; or

       (h)     any increase in the salary or other compensation payable or to become payable to any employee, officer, director of the Company, or the declaration, payment or commitment of any kind for the payment of a bonus or other compensation or benefit.

4.3.3.  <u>Indebtedness</u>  The Company does not have any liabilities or obligations of any nature (whether accrued, absolute, contingent or otherwise) required by GAAP to be set forth on a consolidated balance sheet of the Company except:

(a)     as disclosed, reflected or reserved against in the Interim Balance Sheet;

(b)     for items set forth on Schedule 4.3.3;

(c)     for liabilities and obligations incurred in the ordinary course of business since the date of the Interim Balance Sheet; or

(d)     liabilities in respect of the Contracts.

4.4.   <u>Tax Matters</u>.

4.4.1.  <u>Tax Returns; Disputes</u>.  Except as set forth on Schedule 4.4.1, the Company has filed, within the time and in the manner prescribed by law, all federal, and all material state and local tax returns and reports required to be filed by it with respect to the Acquired Assets and has paid all taxes shown to be due thereon.  All such returns were correct in all material respects.  There are no outstanding assessments or taxes otherwise due that if not paid on a timely basis would result, on or after the Closing Date, in any liens for taxes on any of the Acquired Assets.  There is no pending or, to the knowledge of the Company and the Parent, threatened United States federal or applicable state or local tax audits involving either the Company, the Parent, or any of their affiliates the adverse determination of which could result in a lien upon the Acquired Assets.

4.4.2.  <u>Section 168</u>.  None of the Acquired Assets is tax-exempt use property within the meaning of Section 168(h) of the Internal Revenue Code of 1986, as amended (the "<u>Code</u>").  None of the Acquired Assets is property that is or will be required to be treated as being owned by another person pursuant to the provisions of Section 168(f)(8) of the Internal Revenue Code of 1954, as amended and in effect immediately prior to the enactment of the Tax Reform Act of 1986.

4.4.3.  <u>FIRPTA</u>.  None of Parent, Metro, Dialogue or American is a foreign person within the meaning of Section 1445(f)(3) of the Code.

4.4.4.  <u>Tax Definitions</u>.  As used in this Agreement, the term "tax return" includes any material report, statement, form, return or other document or information required to be supplied to a taxing authority in connection with taxes.  As used in this Agreement, the term "taxes" means any federal, state, local and foreign income or gross receipts tax, alternative or add-on minimum tax, sales and use tax, customs duty and any other tax, charge, fee, levy or other assessment, including, without limitation, property, transfer, occupation, service, license, payroll, franchise, excise, withholding, ad valorem, severance, documentary stamp, gains, premium, windfall profit, employment, rent or other tax, governmental fee or like assessment or charge of any kind whatsoever, together with any interest, fine or penalty thereon, addition to tax, additional amount, deficiency, assessment or governmental charge imposed by any federal, state, local or foreign taxing authority which are payable by the Company.

12

4.5.    Litigation and Claims.

4.5.1.    Litigation Pending or Threatened.  Except as set forth on Schedule 4.5.1, there is no action, suit, claim, arbitration, proceeding or investigation pending or to the knowledge of the Company, threatened before any court, tribunal, panel, master or governmental agency, authority or body in which the Company or the Parent is a party or which might affect the Company, the Acquired Assets or the Business.  Schedule 4.5.1 sets forth all litigation to which the Company is party, or has been a party since January 1, 2003.

4.5.2.    Business Enjoined.  Neither the Company nor the Parent, nor any employee, manager or agent of the Company has been permanently or temporarily enjoined by any order, judgment or decree of any court or tribunal or any other agency from engaging in or continuing any conduct or practice in connection with the Business.

4.5.3.    Violation of Law; Permits.  To the knowledge of the Company or the Parent, the Company is not in violation of any provision of any law, decree, order or regulation applicable to the Company or its business, properties or assets, including, without limitation, those relating to antitrust or other anticompetitive practices, to employment practices (such as discrimination, health and safety), and to minority business enterprises, except for such violations which, singly or in the aggregate, would not reasonably be expected to have a material adverse effect on the Company.  Except as set forth on Schedule 4.5.3, the Company has all Permits required with respect to the Acquired Assets or in the conduct of the Business and the operation of the Real Property, all of which Permits are set forth on Schedule 4.5.3, and has satisfied all bonding requirements pertaining to its operations under federal, state, local and foreign laws, rules and regulations.  To the knowledge of the Company or the Parent, no pending federal, state or local zoning or use regulation, restriction or compliance requirement materially and adversely affect the Acquired Assets or the Business.  The present conduct of the Business is not dependent upon any so-called "non-conforming use" exception nor based upon any zoning variance.

4.6.    Properties and Assets of the Company.  Except as set forth on Schedule 4.6, the Company owns or otherwise has the right to use all of the properties and assets, real and personal, tangible and intangible, now owned or used by it in the operation of the Business.  Upon consummation of the transactions contemplated by this Agreement, the Buyer will acquire good and marketable title to the Acquired Assets, free and clear of all liens, charges, encumbrances, equities and claims, conditions and restrictions, whether either individually or in the aggregate, that would have a material adverse effect on the present use, operation, value or enjoyment of any of the Acquired Assets.  The Acquired Assets are sufficient in all material respects to permit the Buyer to carry on the Business as presently conducted by the Company and Parent.

4.6.1.    Title to Real Property.

(a)    The Company does not own or have any legal or equitable title in any real property and Schedule 4.6.1 is a true, correct and complete list and description of each lease of real property under which the Company is a lessee, lessor, sublessee or sublessor (the "Leased Property") and which is being leased to the Buyer.  The Leased

13

Property and the real property subject to the Leases sometimes collectively are referred to as the "Real Property."

(b)     The Company has good and marketable leasehold title to the Leased Property and to all improvements thereon and the Company's interests therein are free and clear in each case of all mortgages, liens, encumbrances, leases, equities, claims, shares, easements, rights-of-way, covenants, conditions and restrictions, which either individually or in the aggregate would have a material and adverse affect on the present use, operation, value or enjoyment of any of the Leased Property.

(c)     Except as set forth on Schedule 4.6.1(c), the Leased Property currently is being used only as offices of the Company.

4.6.1.1. _Assessments_.  To the knowledge of Company and Parent there is no special proceeding pending or threatened, in which any taxing authority having jurisdiction over any of the Real Property is seeking to increase the assessed value thereof.

4.6.1.2. _Property Leases_.  True and complete copies of all leases to which the Company is a party respecting any Real Property and all other instruments granting such leasehold interests, rights, options or other interests (including all amendments, modifications and supplements thereto) have been delivered to the Buyer (the "Property Leases").

4.6.1.3  _No Breach or Event of Default; Property Leases_.  With respect to the Property Leases, except as set forth on Schedule 4.6.1.3 hereto, no breach or event of default on the part of any party to the Property Leases and no event that, with the giving of notice or lapse of time or both would constitute such breach or event of default, has occurred and is continuing.  Except as set forth on Schedule 4.6.1.3 hereto, to the knowledge of the Company and the Parent all of the Property Leases are in full force and effect and are valid and enforceable against the parties thereto in accordance with their terms.  Except as set forth on Schedule 4.6.1.3 hereto, all rental and other payments due under each of the Property Leases have been duly paid in accordance with the terms of such Property Leases.  Except as set forth on Schedule 4.6.1.3 hereto, to the knowledge of the Company and the Parent the assignment of all of the Company's right, title and interest in and to the Property Leases pursuant to this Agreement does not require the consent of any party to and will not constitute an event of default under or permit any party to terminate or change the existing terms of any Property Lease.

4.6.1.4  _Violation of Law_.    None of the Real Property or any condition or activity thereon, any plants, buildings, fixtures, or improvements located thereon, or the current use, operation or maintenance thereof is in violation of any law, rule, regulation, code or ordinance or is in violation of the terms of any restrictive covenant or other encumbrance which either individually or in the aggregate would have a material adverse effect on the present use, operation, value or enjoyment of any of the Acquired Assets.

4.6.1.5  _Location_.  The Company does not in the ordinary course of business maintain any assets outside of the States of New York, Florida, New Jersey and Georgia.

14

4.6.2.  Intellectual Property.

(a)    The term "Intellectual Property" as used herein means any and all of the following as existing under the laws of any jurisdiction throughout the world: patent disclosures, patent and design patent rights (including any and all continuations, continuations-in-part, divisionals, provisionals, reissues, reexaminations and extensions thereof), inventions, discoveries and improvements, whether patentable or not; trademarks, service marks, trade names, trade dress, and all goodwill symbolized by or associated with any of the foregoing; copyrights, works of authorship whether or not published and whether or not fixed in tangible form, moral rights, neighboring rights, performer's rights, rights arising under any law or convention granting protection analogous to or in lieu of copyright protection (including but not limited to for the protection of phonograms); rights relating to trade secrets (including trade secrets as defined in both common law and applicable statutory law), confidential business, technical and know-how information; Internet domain names, World Wide Web URLs and addresses; software source codes and object codes, databases, database rights, and rights in data; rights of publicity, rights regarding the use of any person's name, likeness, or biography, and rights regarding the use of any video or audio recording of any person; all rights acquired by license with respect to any of the foregoing; all registrations granted or pending with respect to any of the foregoing; and all causes of action against any person for the infringement of any of the foregoing.  "Owned Intellectual Property" means Intellectual Property used in the Business that is owned by the Company.  "Other Intellectual Property" means Intellectual Property used in the Business that is not Owned Intellectual Property.  The term "infringement" and related verbs include all uses that violate the rights of the Intellectual Property owner.

Schedule 4.6.2-1 contains a complete and correct list of all published materials, whether or not now in print, Intellectual Property in which is owned by the Company, including all copyright registrations relating thereto.  It is understood that (i) all titles shown thereon (other than the titles of books published under license from other publishers) are trademarks of the Company, whether or not registered, ownership of which is being assigned hereunder to Buyer; and (ii) that the original Certificates of Copyright Registration are among the Acquired Assets.

Schedule 4.6.2-2 contains a complete and correct list of all materials not published as of the date hereof but under development or otherwise intended for or under consideration for publication in connection with the Business, including all copyright registrations relating thereto.  It is understood that all titles shown thereon are under consideration for adoption as trademarks by the Company, and that the exclusive right to use such titles is being assigned hereunder to Buyer.

Schedule 4.6.2-3 contains a complete and correct list of all Contracts between the Company and any third party pursuant to which the Company is required to pay royalties to any third party in respect of Owned Intellectual Property.

Schedule 4.6.2-4 contains a complete and correct list of all Contracts between the Company and the owners of Other Intellectual Property, and there is no

15

Other Intellectual Property included in the works listed on Schedules 4.6.2-1 and 4.6.2-2 for which no such Contract exists.

Schedule 4.6.2-5 contains a complete and correct list of all existing and pending registrations of patents, trademarks, service marks, and trade dress rights of the Company. It is understood that the original registration certificates are among the Acquired Assets.

All registrations listed on Schedules 4.6.2-1 and 4.6.2-5 are valid, enforceable and subsisting. All necessary registration, maintenance and renewal fees in connection with such items have been paid, and all necessary documents and certificates in connection therewith have been filed with the relevant patent, copyright, trademark, or other authorities in the United States or foreign jurisdictions, as the case may be, for the purpose of maintaining such items. To the knowledge of the Company and the Parent, there are no actions that must be taken by the Company within one hundred twenty (120) days after the Closing Date for the purpose of obtaining, maintaining, perfecting, preserving or renewing such items.

Schedule 4.6.2-6 contains a complete and correct list of all existing Contracts pursuant to which the Company has granted any rights in any Intellectual Property to any third party.

The Buyer is relying on the Company for the completeness of the above schedules and any Contract or other thing omitted from any of such schedules will nevertheless be subject to all provisions of this Agreement, including but not limited to Section 1.1 above and the warranties contained in this Section 4.6.2, notwithstanding such omission.

(b)      Except as set forth on Schedule 4.6.2-7 or as could not reasonably be expected to have a material adverse effect on the Company or the Business, neither the Company nor the Parent has received a "cease and desist letter" or any other written or oral communication from any third party challenging the Company's ownership or rights in any Owned Intellectual Property or in any Other Intellectual Property exclusively licensed by the Company, and there is no action pending or, to the knowledge of the Company or the Parent, threatened against the Company or relating to the Business claiming that the Company or the Business has infringed or is infringing any Intellectual Property of any third party. To the knowledge of the Company or the Parent, there neither has been nor currently exists any infringement of any Owned Intellectual Property or any exclusive license owned by the Company in any Other Intellectual Property, by any third party including, without limitation, any employee or former employee of the Company or the Parent.

(c)      The Company owns or otherwise has a valid right or license to all Intellectual Property used in the Business. The Buyer will acquire all right, title and interest in and to the Owned Intellectual Property free and clear of any and all liens, security interest, charge or encumbrances on the Closing Date upon the consummation of the transactions contemplated by this Agreement. Except to the extent waived in writing

16

by the Buyer at its sole discretion, the Company will have sent to the appropriate owners of Other Intellectual Property, by the Closing Date, requests for permission to assign to the Buyer all licenses that the Company has received for such property, and all such permissions will be furnished to the Buyer upon receipt.  Subject to receipt of such permissions, the Buyer's rights and licenses with respect to the Owned Intellectual Property and Other Intellectual Property will be sufficient for the conduct of the Business.

   (d) True and complete copies of all Contracts indentified on Schedules 4.6.2-3, 4.6.2-4, and 4.6.2-6 have been delivered or made available to the Buyer.  Except as set forth on Schedule 4.6.2-8, to the knowledge of the Company and the Parent, all such Contracts are valid and enforceable and in full force and effect, and to the knowledge of the Company and the Parent, there exists no event or condition that does or will result in a breach or violation of, or constitute (with or without due notice or the lapse of time or both) a default by any party thereunder, or any condition that would result in a reversion of rights to the other party thereto.  To the knowledge of the Company and the Parent, no party to any such Contract intends to cancel, withdraw, modify or amend any such contract.

   (e) The Company has, consistent with reasonable business judgment, taken appropriate steps to protect, preserve and maintain the secrecy and confidentiality of the Company's confidential information and to preserve and maintain all of its interests and proprietary rights in the Owned Intellecual Property used in the Business.  All officers, employees and consultants of the Company and the Parent having access to confidential information of the Company or its customers or business partners have executed and delivered to the Company or the Parent an agreement regarding the protection of such proprietary information (in the case of proprietary information of the Company's customer and business partners, to the extent required by such customers and business partners) and true and complete copies of all such agreements have been delivered or made available to the Buyer.  All such agreements and the right to enforce such agreements, to the extent that the same apply to the Acquired Assets, are among the Acquired Assets.

   (f) No individual, partnership, corporation, limited liability company, trust, joint venture, unincorporated organization or government body (each a "Person") who worked on the creation, development or improvement of the Owned Intellectual Property has any right, license, claim or interest whatsoever in or with respect to any such Intellectual Property.  Without the limitation of the foregoing, all works listed on Schedule 4.6.2-1 and (to the extent of their current development) Schedule 4.6.2-2 were or have been created entirely by employees of the Company within the scope of their employment, by third parties pusuant to valid and binding agreements designating their work product as work made for hire, and/or by third parties under such circumstances that their work product is work made for hire of which the Company is the author and owner as a matter of law.

   (g) Except for obtaining any consents for the transfer and assignment of Contracts relating to the Intellectual Property, in accordance with the terms of such

17

Contracts, where such consents have not been obtained prior to the Closing Date as indicated on Schedule 4.12, the execution, delivery and performance of this Agreement and the transactions contemplated hereby will not: (i) constitute a breach or default under any instrument, contract, license or other agreement governing any Intellectual Property used in the Business; (ii) cause the forfeiture or termination, or give rise to a right of forfeiture or termination, of any Intellectual Property used in the Business; or (iii) in any way impair the right of the Buyer to use (including distribute, manufacture, market, license, sell or dispose of in any way) any Intellectual Property used in the Business.

(h)     The use, development, manufacture, marketing, distribution, license, sale, furnishing or intended use of any product or service currently utilized, manufactured, marketed, distributed, sold, or furnished by the Company or otherwise included in the Acquired Assets does not violate any license or agreement between the Company and any third party or, to the knowledge of the Company and the Parent, infringe any Intellectual Property of any other Person.

(i)     To the knowledge of the Company and the Parent, no Public Software (as defined below) (i) was or is used in connection with the development of any Owned Intellectual Property, or (ii) was or is incorporated in whole or in part, or has been distributed, in whole or in part, in conjunction with any Owned Intellectual Property. "Public Software" means any software that contains, or is derived (in whole or in part) from, any software that is distributed as free software, open source software (e.g., Linux) or similar licensing or distribution models, including, but not limited to, software licensed or distributed under any of the following licenses or distribution models, or licenses or distribution models similar to any of the following: (A) GNU's General Public License (GPL) or Lesser/Library GPL (LGPL); (B) the Artistic License (e.g., PERL); (C) the Mozilla Public License; (D) the Netscape Public License; (E) the Sun Community Source License (SCSL); (F) the Sun Industry Standards License (SISL); (G) the BSD License; and (H) the Apache License.

4.7.    Insurance.  Schedule 4.7 sets forth a true and complete list and description of all insurance policies of any nature whatsoever currently maintained by the Company affecting the Acquired Assets or the Business, together with the annual premiums currently payable by the Company under each such policy, the period of coverage and loss records for the last three insurance years.  There are no outstanding requirements or recommendations by any insurance company that issued any such policy or by any Board of Fire Underwriters or other similar body exercising similar functions or by any governmental authority exercising similar functions which requires or recommends any repairs or other work to be done on or with respect to any of the property or assets of the Company insured in any of said policies.  The Company has not received any notice or other communication from any such insurance company within three years preceding the date hereof canceling or materially amending any of said insurance policies and to the knowledge of the Company and the Parent, no such cancellation or amendment is threatened.  All such policies of insurance are on an occurrence basis and will be in full force and effect on the Closing Date and the consummation of the transactions contemplated hereby will not cause a cancellation or reduction in the coverage of such policies.

4.8.    <u>Labor and Employment Matters</u>.

4.8.1.    <u>Labor and Employment Definitions</u>.  Capitalized terms used in this Section 4.8 which are not otherwise defined in this Agreement shall have the respective meanings as set forth below:

"<u>Employee Benefit Plan</u>" shall mean each ERISA Plan and each other pension, profit sharing, retirement, bonus, incentive, change in control, equity compensation, health, welfare, disability, loan or loan guaranty, fringe benefit, vacation, sick pay, salary continuation, deferred compensation, stock option, stock purchase, severance pay or other insurance plan, arrangement or practice, whether written or otherwise, for current or former officers, directors, or employees, which currently is, or within the immediately preceding six years was, established, maintained, contributed to or legally obligated to be contributed to by the Company or by a current or former ERISA Affiliate, or with respect to which the Company or any ERISA Affiliate otherwise have any liability or obligation.

"<u>ERISA</u>" shall mean the Employee Retirement Income Security Act of 1974, as amended, and the regulations and rules issued thereunder.

"<u>ERISA Affiliate</u>" shall mean any corporation which is a member of a controlled group of corporations with the Company within the meaning of Section 414(b) of the Code, a trade or business (including a sole proprietorship, partnership, trust, estate or corporation) which is under common control with the Company within the meaning of Section 414(c) of the Code or a member of an affiliated service group with the Company within the meaning of Section 414(m) or (o) of the Code.

"<u>ERISA Plan</u>" shall mean any Pension Plan and any Welfare Plan.

"<u>Multiemployer Plan</u>" shall mean a plan as defined in Section 3(37) of ERISA.

"<u>Pension Plan</u>" shall mean each employee pension benefit plan within the meaning of Section 3(2) of ERISA which is established, maintained or as to which there is an obligation to contribute by or on behalf of the Company or any ERISA Affiliate, or under which the employees of the Company or any ERISA Affiliate receives any benefits.

"<u>Welfare Plan</u>" shall mean each employee welfare benefit plan within the meaning of Section 3(1) of ERISA which is established, maintained or to which there is an obligation to contribute by or on behalf of the Company or any ERISA Affiliate, or under which the employees of the Company or any ERISA Affiliate receives any benefits.

4.8.2.    <u>Employee Benefit Plans</u>.

(a)    Schedule 4.8.2(a) lists each Employee Benefit Plan and clearly identifies each as a Pension Plan, Welfare Plan or other type of Employee Benefit Plan.  Each Employee Benefit Plan materially complies with, and has been established, maintained, and operated in all material respects in accordance with, all applicable laws, including, without limitation, provisions of ERISA and

19

the Code, and no event has occurred in connection with any Employee Benefit Plan which has, will or may result in any fine, penalty, assessment or other liability for which the Company or a transferee of assets from the Company may be responsible, whether by reason of operation of law or contract.

(b)     Neither the Company nor any ERISA Affiliate has an obligation to contribute to any Multiemployer Plan and has had no such obligation during the six years preceding the Closing Date.

(c)     The Company or any ERISA Affiliate does not maintain or contribute to or have an obligation to contribute to any Pension Plan covered by Title IV or Section 302 of ERISA, Section 412 of the Code or described as a defined benefit plan (in accordance with ERISA Section 3(35)), and has not maintained or contributed to any such plan during the six years preceding the Closing Date.

(d)     The Company has delivered to the Buyer true and correct copies of the following:

(i)     each Employee Benefit Plan listed on Schedule 4.8.2 and all amendments thereto;

(ii)     each trust agreement pertaining to any of the Employee Benefit Plans, including all amendments to such documents;

(iii)     the most recent determination letter issued by the Internal Revenue Service (the "IRS") with respect to each of the Pension Plan's qualification under Section 401(a) of the Code and recognition of exemption from federal income taxation under Section 501(a) of the Code of each funded Welfare Plan and, to the extent that an application is pending with the IRS, copies of such applications have been provided;

(iv)     the two most recent Annual Reports (IRS Form 5500 series), including all schedules and plan audits, if applicable, required to be filed with respect to each ERISA Plan; and

(v)     each current summary plan description relating to each Employee Benefit Plan.

(e)     Except as set forth on Schedule 4.8.2, there is no action, suit or claim pending (other than routine claims for benefits) or that reasonably could be expected to be asserted against any Employee Benefit Plan or the assets of any Employee Benefit Plan.  No civil or criminal action brought pursuant to the provisions of Title I, Subtitle B, Part 5 of ERISA is pending or threatened or reasonably expected to be asserted against any fiduciary of any ERISA Plan. None of the ERISA Plans or any fiduciary thereof is or has been the direct or indirect subject of an audit investigation or examination by any governmental or quasi-governmental agency.

20

(f)    All of the Employee Benefit Plans currently comply, and have complied in the past, both as to form and operation, with their terms and with the applicable provisions of ERISA, the Code and other applicable Federal, state, local and foreign laws. All necessary governmental approvals for the Employee Benefit Plans have been obtained and a favorable determination as to the qualification under Section 401(a) of the Code of each of the Pension Plans and of each amendment thereto has been made by the IRS and a recognition of exemption from Federal income taxation under Section 501(a) of the Code of each of the funded Welfare Plans, if any, has been made by the IRS. Nothing has occurred since the date of each such determination or recognition letter that would adversely affect such qualification or exemption.

(g)    No transaction or occurrence proscribed by Section 406 of ERISA, or subject to tax under Section 4975 of the Code, has occurred or is occurring for which a statutory exemption is not available.

(h)    No payment has been made nor is the Company a party to any agreement, contract, arrangement or plan pursuant to which a payment could be made, separately or in the aggregate (including but not limited to individual employment, change in control, and severance agreements), which is not deductible for federal income tax purposes by virtue of Section 280G of the Code (without regard to the exception set forth in Section 280G(b)(4) of the Code) or which is not deductible under Section 162 or 404 of the Code.

(i)    Except for the necessity to make the Murray Payment and the Chua Payment, neither the execution and delivery of this Agreement, including without limitation, all other agreements to be executed in connection herewith, by the Company nor the consummation of the transactions contemplated herein will (i) result in the acceleration or creation of any rights of any person entitled to any benefits under any Employee Benefit Plan, (ii) entitle any current or former employee or director of the Company or any ERISA Affiliate to severance pay, unemployment compensation or any other payment or give rise to any such payment (regardless of when such payment is made or payable), (iii) accelerate the time of payment or vesting, result in deemed satisfaction of goals or conditions, or increase the amount of any compensation due to any such employee or former employee or director, or (iv) result in the forgiveness, modification or guaranty of any loan benefiting any current or former employee or director of the Company or any ERISA Affiliate.

(j)    With respect to each Employee Benefit Plan and any other similar arrangement or plan either currently or previously terminated, maintained, or contributed to by any entity which either is currently or was previously under common control with the Company or any ERISA Affiliate as determined under Code Section 414 and ERISA Section 3(5), and except for liabilities expressly assumed by the Buyer pursuant to this Agreement, no event has occurred and no condition exists that after the Closing Date could subject the Buyer or the Company directly or indirectly, to any liability (including liability under any

indemnification agreement) under Section 412, 413, 4971, 4975, or 4980B of the Code or Section 302, 502, 515, 601, 606, or Title IV of ERISA.

(k)    Neither the Company nor any ERISA Affiliate has any obligation to provide health benefits or other non-pension benefits to any retired or other former director, employee or their dependents, except as specifically required by Section 4980B of the Code or Part 6 of Title I of ERISA, and the Company and each ERISA Affiliate has complied in all material respects with the requirements of Section 4980B of the Code and such Part 6.

4.8.3.  Benefit Obligations.  Except as set forth on Schedule 4.8.3, all accrued material obligations for payments to any entity, plan or person with respect to any benefits for current or former employees of the Company or any ERISA Affiliate have been timely paid or adequate accruals therefor have been made in the Financial Statements in accordance with GAAP.

4.8.4.  Performance.  The Company has withheld and paid to the appropriate governmental authorities or is withholding for payment not yet due to such authorities all amounts required to be withheld from the employees of the Company, and the Company is not liable for any arrears of such amounts or penalties thereon for failure to comply with any of the foregoing.  The Company has complied in all material respects with all applicable laws, rules and regulations relating to the employment of labor, including those relating to wages, hours, collective bargaining and the payment and withholding of taxes and other sums as required by appropriate governmental authorities.

4.8.5.  Compensation.  All reasonably anticipated material obligations of the Company for salaries, bonuses and other forms of compensation payable to the employees and directors of the Company in respect of the services rendered by any of them have been paid or adequate accruals therefor have been made in the Financial Statements in accordance with GAAP for obligations accrued through the date of the applicable Financial Statements.

4.8.6.  Resignations.  Except as set forth on Schedule 4.8.6, no employee of the Company included on the Employee List (as defined below), to the best knowledge of the Company and the Parent, plans to retire or resign during the 12-month period following the Closing Date or otherwise be unavailable as an employee of the Buyer at compensation substantially similar to such employee's present rate of compensation.

4.8.7.  Collective Bargaining Agreements.

(a) The Company is not, and has never been, a party to a collective bargaining agreement with any labor organization.  No organization effort, demand for recognition, petition seeking a representation proceeding or representation question involving any union association or collective bargaining representative is pending respecting the employees of the Company, and no such question has been raised with respect to the Company.

(b)    There is no controversy pending between the Company or any Subsidiary and any of their respective employees.  To the knowledge of the Company,

there is no basis for any claim, grievance, arbitration, negotiation, suit, action or charge of or by any employee of the Company or any Subsidiary, and no complaint is pending against the Company or any Subsidiary before the National Labor Relations Board or any other federal, state or local agency.  The Company and the Subsidiaries have complied, in respect of their employees, in all material respects with all applicable statutes, regulations, orders and restrictions of the United States of America, all states and other subdivisions thereof, all foreign jurisdictions and all agencies and instrumentalities of the foregoing.

(c)    The Parent and the Company have furnished the Buyer with copies of all claims, complaints, reports or other documents concerning the Company or any of the Subsidiaries or their employees made by or against the Company or any Subsidiary during the past five years pursuant to workers' compensation laws, Title VII of the Civil Rights Act of 1964, the Occupational Safety and Health Act of 1970, the National Labor Relations Act of 1935 or any other federal or state laws relating to employment of labor.

4.8.8.  Obligation to Employ.  Nothing in the representations or warranties contained herein shall be construed as an obligation or commitment of the Buyer to continue the employment of any employee, officer or director of the Company or otherwise assume any liability, including liabilities for salary, benefits, pension, stock options (including, without limitation, any obligation under the Company's 1999 Stock Option and Incentive Plan), severance or other benefit plans of any employee, officer or director of the Company.

4.9.    Compensation of and Indebtedness to and from Employees and the Parent.

4.9.1.  Key Employee Compensation.  Schedule 4.9.1 is a true and complete list of the names and annual compensation (whether in the form of salary, bonus, commission, pension or profit-sharing contributions or other supplemental compensation now or hereafter payable) of the ten (10) highest compensated full-time salaried employees of the Company (the "Employee List").  Such list also identifies each employee for whom the Company provides a vehicle, showing the nature of such arrangement and the annual cost to the Company.  Since the Last Balance Sheet Date there has been no material change in the rate of total compensation for services rendered, including, without limitation, bonuses and deferred compensation, for any of the employees listed on the Employee List.

4.9.2.  Indebtedness.  Except as set forth on Schedule 4.9.2, the Company is not indebted to the Parent, or any employee or agent of the Company, or any spouse, child or other relative thereof, in any amount whatsoever other than for compensation for services rendered since the start of the Company's current pay period generally utilized for its employees and for business expenses, nor is the Parent or any employee or agent indebted to the Company except for advances made in the ordinary course of business.

4.10.  Contracts and Other Instruments.

4.10.1. Contracts.

(a)  Except as set forth on Schedule 4.10.1, neither the Parent nor the Company is a party to any written or oral contracts relating to the Business or the Acquired Assets.

(b)  The Parent and the Company have furnished the Buyer with a true and complete copy of all written contracts, obligations or commitments set forth on Schedule 4.10.1, and with accurate descriptions of all oral contracts, obligations or commitments set forth on Schedule 4.10.1.

(c)  Except as set forth on Schedule 4.10.1, the Company is not in breach of or in default under any of the contracts, obligations or commitments set forth on Schedule 4.10.1, nor has the Company been notified of any breach, default or potential breach or default under any contracts and no event has occurred that, with the giving of notice or lapse of time or both, would constitute such a breach or default.  Except as set forth on Schedule 4.10.1, the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby will not require the consent of any party (other than the Company) to any contract.

4.11.  Environmental Liability.

4.11.1. Hazardous Materials.  Neither the Company, nor the Parent, nor any prior owner, tenant, occupant or user of the Real Property or Former Real Property, nor any other person or concern, has engaged in or permitted any operations or activities upon, or any use or occupancy of, such property or any portion thereof for the purpose of or in any way involving the handling, manufacture, treatment, storage, use, generation, release, discharge, refining, dumping or disposal of any Hazardous Materials (whether legal or illegal, accidental or intentional, excluding de minimis quantities of Hazardous Materials that are commonly used in connection with the operation of the Business and which were used and disposed of in accordance with Environmental Requirements) on, under, in or about any such property or transported any Hazardous Materials to, from or across any such property.  No Hazardous Materials have migrated or are threatening to migrate from other properties upon, about or beneath any Real Property or Former Real Property.

4.11.2. Environmental Requirements.  The Parent, the Company the Real Property and the Former Real Property and the existing and prior uses and activities thereon, including but not limited to the use, maintenance and operation of any such property, and all activities and conduct of business related thereto, comply, and have at all times complied in all material respects, with all Environmental Requirements, and no activity on or condition of the Real Property or Former Real Property has constituted or constitutes a nuisance or has constituted or constitutes a tortuous condition with respect to any third party.  Neither the Parent, nor the Company, nor any prior owner or occupant of the Real Property, pursuant to any existing or proposed law or regulation, is required now or in the foreseeable future to take any remedial

24

action related to any such property or make any capital improvements in order to place such property or the improvements located thereon in compliance with such law or regulation.

4.11.3. <u>Notice of Violations</u>.  Neither the Parent nor the Company, nor any prior owner or occupant of the Real Property or Former Real Property has received notice or other communication concerning or has any knowledge of (A) any violation or alleged violation of Environmental Requirements, whether or not corrected or (B) any alleged liability for Environmental Damages (as defined below) and, there exists no basis for any lawsuit, claim, proceeding, citation, directive, summons or investigation related to either (A) or (B) being instituted or filed.  No writ, injunction, decree, order or judgment related to the foregoing is outstanding.  Neither the Parent, nor the Company, nor any prior owner or occupant of any such property has been ordered or requested by any regulatory authority to take any step to remedy any condition on any such property whether or not constituting a violation of Environmental Requirements, and no such person or entity has been named a "potentially responsible party" with respect thereto.

4.11.4. <u>Potentially Responsible Party</u>.  Neither the Environmental Protection Agency nor any other federal, state or local authority, nor any other person, corporation, partnership, joint venture, association, trust, estate or other entity or organization has identified the Company, the Parent, or any prior owner or occupant of the Real Property or Former Real Property as a "potentially responsible party" or as a party liable in any way for remediation or clean-up activities or notified the Company, the Parent, or any prior owner or occupant of any such property that it may in the future identify the Company, the Parent, or the prior owner or occupant as a "potentially responsible party" or as a party liable in any way for remediation or clean-up activities.

4.11.5. <u>Environmental Reports</u>.  The Company or the Parent has furnished the Buyer with true and complete copies of all claims, complaints, reports assessments, audits, investigations and other documents in the possession of or obtainable by the Company or the Parent made by, on behalf of or against the Company or the Parent relating to the release of Hazardous Material at the Real Property or Former Real Property or any potential or actual Environmental Damages incurred by the Company or the Parent.

4.11.6. <u>Asbestos</u>.  (A) Neither the Parent nor the Company has ever (i) manufactured, sold, distributed, designed, installed, used or specified the use of asbestos or asbestos-containing products for any purpose, nor (ii) has entered into any agreement to indemnify, defend, or hold harmless any other entity for liabilities allegedly arising from or in any way relating to asbestos or asbestos-containing products; (B) there is no suit, claim, action, or proceeding of any nature, whether founded upon negligence, breach of warranty, strict liability, fraud, misrepresentation, conspiracy, fraudulent transfer, or any other legal or equitable theory, pending or, to the knowledge of the Company, threatened against or affecting the Parent or Company in any way relating to the manufacture, design, sale, distribution, installation, specification, presence or use of asbestos or asbestos-containing products; (C) there is no asbestos contained in or forming part of any Real Property or Former Real Property.

4.11.7. <u>Definitions</u>.  For the purposes of this Agreement:

"Environmental Damages" means all claims, judgments, damages, losses, penalties, fines, liabilities (including strict liability), encumbrances, liens, costs and expenses of defense of a claim (whether or not such claim is ultimately defeated), good faith settlements of judgment, and costs and expenses of reporting, investigating, removing and/or remediating Hazardous Materials, of whatever kind or nature, contingent or otherwise, matured or unmatured, foreseeable or unforeseeable, including without limitation reasonable attorney's fees and disbursements and consultants' fees, any of which are incurred at any time arising out of, based on or resulting from (i) the presence or release of Hazardous Materials into the environment, on or prior to the Closing, upon, beneath, or from any Real Property, Former Real Property or other location (whether or not owned by the Company or the Parent) where the Company or the Parent conducted operations or generated, stored, sent, transported, or disposed of Hazardous Materials, (ii) any violation of Environmental Requirements by the Company or the Parent on or prior to the Closing.

"Environmental Requirements" means all applicable statutes, regulations, rules, ordinances, codes, policies, advisories, guidance, actions, licenses, permits, orders, approvals, plans, authorizations, concessions, franchises and similar items of all Governmental Authorities and all applicable judicial and administrative and regulatory decrees, judgments and orders and all covenants running with the land that relate to: (A) occupational health or safety; (B) the protection of human health or the environment; (C) the treatment, storage, disposal, handling, Release or Remediation of Hazardous Materials; or (D) exposure of persons to Hazardous Materials.

"Former Real Property" means any real property in which the Company heretofore held but no longer holds a fee, leasehold or other legal, beneficial or equitable interest.

"Governmental Authority" means any governmental agencies, departments, commissions, boards, bureaus, instrumentalities, courts or tribunals of the United States, the states and political subdivisions thereof.

"Hazardous Materials" means any substance: (A) the presence of which requires reporting, investigation, removal or remediation under any Environmental Requirement; (B) that is defined as a "hazardous waste," "hazardous substance" or "pollutant" or "contaminate" under any Environmental Requirement; (C) that is toxic, explosive, corrosive, flammable, ignitable, infectious, radioactive, reactive, carcinogenic, mutagenic or otherwise hazardous and is regulated under any Environmental Requirement; (D) the presence of which causes or threatens to cause a nuisance, trespass or other tortious condition or poses a hazard to the health or safety of persons; (E) that contains gasoline, diesel fuel or other petroleum hydrocarbons, PCBs, asbestos or urea formaldehyde foam insulation.

4.12.   Agreement Not in Breach of Other Instruments.

(a)     Except as set forth on Schedule 4.12, the execution and delivery by the Company and the Parent of this Agreement does not, and the consummation of the transactions contemplated hereby will not, result in the creation of any lien, security interest, charge or encumbrance upon the Acquired Assets or the Business under, conflict with or result in a breach of, create an event of default (or event that, with the giving of

notice or lapse of time or both, would constitute an event of default) under, or give any third party the right to accelerate any obligation under, any agreement, mortgage, license, lease, indenture, instrument, order, arbitration award, judgment or decree to which the Parent or the Company is a party or by which the Parent, the Company, the Acquired Assets or the Business, is bound or affected.

(b)    The execution and delivery by the Company and the Parent of this Agreement do not, and the consummation of the transactions contemplated hereby will not, result in a violation of, or require any authorization, approval, consent or other action by, or registration, declaration or filing with or notice to, any court or administrative or governmental body pursuant to, any statute, law, rule, regulation or ordinance applicable to the Parent or the Company.  There is no pending or threatened action, suit, proceeding or investigation before or by any court or governmental body or agency, to restrain or prevent the consummation of the transactions contemplated by this Agreement or that might affect the right of the Buyer to own the Acquired Assets or to operate the Business.

(c)    The execution and delivery by the Company and the Parent of this Agreement do not, and the consummation of the transactions contemplated hereby will not, result in or create in any third party any right to avoid or otherwise set aside this Agreement or any of the transactions contemplated hereby under any fraudulent conveyance or similar statute or law (including Article 10 of the New York Debtor & Creditor Law and Section 548 of the U.S. Bankruptcy Code, a "Fraudulent Transfer Law").  The transactions contemplated by this Agreement are each for a "fair consideration" and "reasonably equivalent value" within the meaning of any Fraudulent Transfer Law and are not being entered into with the intent to hinder, delay or defraud either present or future creditors of the Company or Parent within the meaning of any such law.

4.13.    Regulatory Approvals.  The Company has obtained all consents, approvals, authorizations and other requirements prescribed by any law, rule or regulation which must be obtained or satisfied by the Company and, prior to the Closing Date, shall have obtained all such consents, approvals, authorizations and other requirements which are necessary for the consummation of the transactions contemplated by this Agreement.

4.14.    Inventories.  The Inventories as of the Closing Date, net of the reserve for bad inventory as of the Balance Sheet Date of the Company as of the Closing Date, as reflected on Schedule 4.14 hereto, are good and merchantable (subject to damaged or otherwise unsellable inventories being no greater than is normal for the Company in the ordinary course of business consistent with past practice) (it being understood by the parties hereto that the $915,059.85 inventory write-down recorded in August, 2003 as a prior adjustment effected in December, 2002 shall not be deemed to be an ordinary course transaction and any write-downs subsequent to that date shall not include the $951,059.85 write-down in the determination of whether any subsequent write-down was consistent with past practice).  The quantities of all inventories are reasonable and consistent with past practice of the Company.  The Inventories set forth in the Interim Balance Sheet of the Company at August 31, 2003 have been valued in accordance with generally accepted accounting principles consistently applied throughout the period covered. The Inventories of the Company reported on the Interim Balance Sheet were valued in the same

manner employed by the Company to report inventory on the Financial Statements for the fiscal year ended December 31, 2002.

4.15.   Disclosure.  The Company has disclosed to the Buyer all facts known to the Company (after reasonable investigation and inquiry) material to the Acquired Assets, the Business and the Assumed Liabilities, and neither the Parent nor the Company knows of any facts or circumstances that might reasonably be expected to result in any material adverse change to the Acquired Assets, the Business and Assumed Liabilities.

4.16.   Brokerage.  Except for Berkery, none of the Company, the Parent or any employee or agent of the Company has dealt with any finder or broker in connection with any of the transactions contemplated by this Agreement or the negotiations looking toward the consummation of such transactions who may be entitled to a fee in connection therewith.  Any fees payable to any finder or broker, including but not limited to the fees payable to Berkery, shall be the sole responsibility of the Parent and the Company and under no circumstances shall the Buyer have any liability therefor other than payment to Berkery on behalf of the Company of the amount set forth on Schedule 1.3(b).

4.17.   Bank Accounts.  Schedule 4.17 sets forth a true and complete list of the bank name, location and account number for all bank accounts used by the Company in the conduct of the Business, and the authorized signatories and amounts for such accounts.

4.18.   Ownership of Capital Stock.  The Parent directly owns 100% of the outstanding capital stock and voting power of the Company.  The authorized capitalization of the Parent consists of :

(i)      50,000,000 shares of common stock, par value $0.01 per share, of which 6,342,000 shares are issued and outstanding;

(ii)     1,250,000 shares of Convertible Preferred Stock, Series A, par value $0.01 per share, all of which are issued and outstanding;

(iii)    18,200,000 shares of Convertible Preferred Stock, Series B, par value $0.01 per share, of which 13,255,456 shares are issued and outstanding;

(iv)     1,600,000 shares of Convertible Preferred Stock, Series C, par value $0.01 per share, all of which are issued and outstanding;

(v)      100 shares of Preferred Stock, Series D, par value $0.01 per share, none of which are issued or outstanding;

(vi)     1,100,000 shares of Convertible Preferred Stock, Series E, par value $0.01 per share, of which 736,843 shares are issued and outstanding; and

(vii)    5,408,000 shares of Convertible Preferred Stock, Series F, par value $0.01 per share, none of which are issued or outstanding.

80270310_11 (4).DOC

Schedule 4.18 lists all of the stockholders of the Parent and their holdings by class or series of stock. Other than as set forth on Schedule 4.18, there are no agreements, including stockholders agreements, warrants, puts, calls, rights, preemptive rights, options or other commitments of any character to which the Parent is a party or by which the Parent is bound that (x) obligations the Parent to issue, deliver, register or sell any additional shares of its capital stock or any securities or instruments convertible into or exchangeable for any such additional shares of capital stock or (y) could affect this Agreement or the transactions contemplated hereby. The shares of capital stock of Parent are duly and validly issued, fully paid and non-assessable.

4.19. Customers. Set forth on Schedule 4.19 is a complete list of the 20 largest (in terms of dollar volume) customers of the Company for the fiscal year ended December 31, 2002 and for the eight month period ended August 31, 2003 indicating the amount of commissions and fees paid to the Company by each customer for each such year and the names of the employees (or independent sales representatives) of the Company who are primarily responsible for servicing each such customer as of the date hereof. None of such customers has terminated or, to the knowledge of the Company, indicated an intention or plan to terminate all or a material part of the services performed for or orders historically placed by such customers, and the Parent and the Company have no reason to believe that any of such customers may terminate all or a material part of such services or orders, whether by reason of the acquisition of the Acquired Assets by the Buyer or for any other reason. The Company has received no notice of, and neither the Parent nor the Company knows of any basis for, any material complaint by any of such customers with respect to services provided or products delivered by the Company since January 1, 2003.

4.20. Suppliers. Set forth on Schedule 4.20 is a complete list of each supplier from whom the Company purchased greater than $2,000 of goods or services during the fiscal year ended December 31, 2002.

5. Representations and Warranties of the Buyer. The Buyer represents and warrants to the Company and the Parent, as of the date hereof, as follows:

5.1. Organization. The Buyer is duly organized and incorporated and is validly existing as a corporation in good standing under the laws of the State of Delaware with the corporate power and authority to execute, deliver and perform this Agreement, to own its properties and carry on its business in the manner in which such business is now being conducted.

5.2. Authority. The Buyer has full corporate power and authority to enter into this Agreement and to consummate the transactions contemplated hereby. This Agreement and all other agreements to be executed in connection herewith by the Buyer have been duly executed and delivered by the Buyer, have been effectively authorized by all necessary action, corporate or otherwise, by the Buyer and constitute legal, valid and binding obligations of the Buyer enforceable in accordance with their respective terms.

5.3 Capitalization; the Shares The authorized capitalization of Cambium consists of 156,000,000 shares of common stock and 200,000,000 shares of preferred stock.

29

Immediately after the consummation of the transactions contemplated hereby, but prior to giving effect to any subsequent issuances or purchases of Cambium's securities, there will be 0 shares of common stock issued and outstanding and 4,896,907 shares of preferred stock issued and outstanding (including, without limitation, the Shares). The Shares have been duly and validly authorized and, upon issuance in partial payment for the Acquired Assets hereunder, will be duly and validly issued, fully paid and non-assessable. The Buyer is a wholly-owned subsidiary of Cambium.

   5.4 <u>No Violations, Consents</u>  The execution, delivery and performance by the Buyer and Cambium of this Agreement and the consummation of the transactions contemplated hereby and thereby will not (i) violate any provision of the articles of organization or operating agreement of the Buyer or Cambium, as applicable; (ii) violate, or require any consent, authorization or approval of, or exemption by, or filing under any provision of any law; statute, rule or regulation to which the Buyer or Cambium is subject, as applicable; (iii) violate any judgment, order, writ or decree of any court applicable to transaction contemplated herein; or (iv) conflict with, result in a breach of, constitute a default under, or accelerate or permit the acceleration of the performance required by, or require any consent, authorization or approval under any agreement, contract, commitment, lease or other instrument, document or undertaking to which the Buyer is a party or any of its assets is bound.

   5.5 <u>Legal Proceedings</u>  There is no claim, action, suit, proceeding, investigation or inquiry pending before any federal, state or other court or governmental or administrative agency or, to the Buyer's knowledge, threatened against the Buyer or any of the Buyer's properties, assets, operations or businesses that might prevent or delay the consummation of the transactions contemplated hereby.

   6. <u>Non-Compete and Solicitation</u>.  In consideration of, among other things, the Purchase Price set forth in this Agreement, during the period from the date hereof through the fifth anniversary of the date hereof, neither the Company nor the Parent will:

     (a) directly or indirectly, engage or invest in, own, manage, operate, finance, control or participate in the ownership, management, operation, financing, or control of, be employed by, associated with, or in any manner connected with, lend the Company's or the Parent's credit to, or render services or advice to, any business, firm, corporation, partnership, association, joint venture or other entity that engages or conducts any business engaged in or connected by the Company as of the Closing Date anywhere within the United States;

     (b) directly or indirectly, either for itself or any other person or entity, hire any of the officers or directors or other persons employed by Buyer, its Affiliates and their respective successors or assigns, or solicit or induce such persons to leave the employ of Buyer and its Affiliates.

     (c) directly or indirectly, approach or seek business from any Customer (as defined below), refer business from any Customer to any enterprise or business or be paid commissions based on business sales received from any Customer by any enterprise or business.  For purposes of this Section 4.6(a)(iii), the term "<u>Customer</u>"

means any person, firm, corporation, partnership, association or other entity to which the Company, the Parent, the Buyer, any Affiliate of the Buyer, or any of their successors or assigns, provided goods or services during the 36-month period prior to the time at which any determination shall be made that any such person, firm, corporation, partnership, association or other entity is a Customer, provided, however, that the term Customer shall not include any referral of business by the Company or the Parent to Buyer.  For the purposes of this Agreement, the term "Affiliate" shall mean, as applied to any Person, (i) any entity controlling, controlled by or under common control with such Person, (ii) any other Person that owns or controls 10% or more of any class of equity securities (including equity securities issuable upon the exercise of any option or convertible security) of that Person or any of its Affiliates or (iii) any director, partner, officer, manager, agent, employee or relative of such Person.  For purposes of the definition of Affiliate, "control" (including with correlative meanings, the terms "controlling", "controlled by", and "under common control with") as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that Person, whether through ownership of voting securities or by contract or otherwise.

7.    Company and Parent Closing Deliveries.  The obligations of the Buyer hereunder shall be subject to the satisfaction, as of the Closing Date, of the following conditions (any of which may be waived, in whole or in part, by the Buyer):

7.1.    Permits, Approvals and Authorizations.  Any and all consents, waivers, permits and approvals from any governmental or regulatory body, and of any Person required in connection with the execution, delivery and performance of this Agreement or necessary for the Buyer to operate the Business substantially in the manner in which it is currently operated shall have been duly obtained and shall be in full force and effect on the Closing Date, unless waived by Buyer, excepting any requirement that the Buyer be qualified as a foreign corporation to do business in any jurisdiction.

7.2.    No Challenge or Violation of Orders.  No investigation, action, suit or proceeding by any governmental or regulatory commission, agency or authority, and no action, suit or proceeding by any other Person shall be pending or threatened on the Closing Date which challenges this Agreement or the closing of the transactions contemplated hereby, or which claims damages as a result of the transactions contemplated hereby.  No preliminary or permanent injunction or other order by any court or governmental or regulatory authority, and no statute, rule, regulation, decree or executive order promulgated or enacted by any government or governmental or regulatory authority, that declares this Agreement invalid in any respect or prevents the consummation of the transactions contemplated hereby, shall be in effect.

7.3.    Certain Documents.  The Company and the Parent shall have furnished the Buyer with the following documents:

(a)    the Bill of Sale;

(b)    a duly executed Contract Assignment;

31

(c)     duly executed Lease Assignments for the properties acquired by the Buyer pursuant to Section 1.1(b);

(d)     duly executed Employment Agreements;

(e)     a duly executed Escrow Agreement;

(f)     termination statements and instruments of release, in form and substance satisfactory to counsel for the Buyer, releasing and discharging all mortgages, liens, claims, charges, security interests, conditional sales contracts, restrictions or other encumbrances against the Acquired Assets or otherwise providing for the release and discharge of such items upon such terms and conditions as are acceptable to Buyer;

(g)     the Certificate of Incorporation of each of Metro, Dialogue and American, certified by the Secretary of State of the State of New York;

(h)     a certificate, dated within a period prior to the Closing Date acceptable to the Buyer, as to the good standing of each of Metro, Dialogue and American and payment of all applicable state taxes thereby, executed by the appropriate officials of the State of New York;

(i)     the originals, or copies certified to the satisfaction of the Buyer, of all Property Leases for properties acquired pursuant to Section 1.1(b);

(j)     except as waived by Buyer, executed originals or copies acceptable to Buyer of all consents, waivers, approvals and authorizations required by law, statute, rule, regulation, contract or agreement to be obtained by the Parent or the Company in connection with the consummation of the transactions contemplated hereby;

(k)     a copy of the resolutions of the board of directors of the Company and the Parent and resolutions of the Parent and its members or shareholders, authorizing the execution and delivery of this Agreement and each of the other Related Agreements to which the Company is a party and the performance of the transactions contemplated hereby and thereby, certified by the secretary of the Company or by the Parent as the case may be;

(l)     a certificate as to the incumbency and signature of the officers of the Company and the Parent executed by an officer or director of the Company or the Parent, as the case may be and by the secretary of the Company or the Parent, as the case may be;

(m)     an acknowledgement from Dennis Chua and Kathy Murray of payment in full of all of the severance payments that they are entitled to receive from the Buyer, the Company and the Parent;

(n)     executed consents from such number of the Parent's shareholders as may be acceptable to the Buyer in its sole discretion to the transactions contemplated by this Agreement;

32

(o)    a duly executed Assignment of Trademark;

(p)    duly executed Copyright Assignments;

(q)    a duly executed assignment of the GE Stop Loss Policy; and

(r)    all other documents specifically required to be produced at the Closing under this Agreement or as reasonably requested by Buyer prior to Closing.

7.4.    Opinion of Counsel to the Company and the Parent.  Counsel to the Company and the Parent shall have delivered to the Buyer an opinion, dated the Closing Date, substantially in the form of Exhibit 7.4.

7.5.    FIRPTA Affidavit.  Each of Metro, American, Dialogue and Parent shall have executed and delivered to the Buyer a certificate of non-foreign status satisfying the requirements of Treas. Reg. § 1.1445-2(b)(2)(i).

7.6.    Performance by the Company and the Parent.  The Company and the Parent shall have performed and complied in all material respects with each of the covenants contained in this Agreement which is required to be performed and complied with by the Company and the Parent on or prior to the Closing Date, and each of the representations and warranties of the Company and the Parent which is set forth in this Agreement shall be true and correct in all respects as of the date of this Agreement and as of the Closing Date.

7.7.    Revised Author Agreements.

(a)    Each of the authors set forth on Exhibit 7.7(a)(i) (the "Authors") hereto shall have entered into an Addendum with the Seller substantially in the form attached as Exhibit 7.7(a)(ii) hereto.

(b)    Advanced Assessment Systems shall have entered into an Addendum substantially in the form of the agreement attached as Exhibit 7.7(b).

(c)    Each of the Authors shall have delivered to the Company a Work for Hire Acknowledgement substantially in the form of Exhibit 7.7(c) hereto.

8.    Buyer's Closing Deliveries.  The obligations of the Company and the Parent hereunder shall be subject to the satisfaction, as of the Closing Date, of the following conditions (any of which may be waived, in whole or in part, by the Company and the Parent):

8.1.    Permits, Approvals and Authorizations.  Any and all consents, waivers, permits and approvals from any governmental or regulatory body and of any Person required in connection with the execution, delivery and performance of this Agreement shall have been duly obtained and shall be in full force and effect on the Closing Date.

8.2.    No Challenge or Violation of Orders.  No investigation, action, suit or proceeding by any governmental or regulatory commission, agency or authority, and no action, suit or proceeding by any other Person shall be pending or threatened on the Closing Date which

33

challenges this Agreement or the closing of the transactions contemplated hereby, or which claims damages as a result of the transactions contemplated hereby. No preliminary or permanent injunction or other order by any court or governmental or regulatory authority and no statute, rule, regulation, decree or executive order promulgated or enacted by any government or governmental or regulatory authority, that declares this Agreement invalid in any respect or prevents the consummation of the transactions contemplated hereby, shall be in effect.

      8.3.   <u>Certain Documents</u>. The Buyer shall have furnished the Company and the Parent with the following documents:

      (a)    a duly executed Contract Assignment;

      (b)    duly executed Lease Assignments for the properties acquired by the Buyer pursuant to Section 1.1(b);

      (c)    duly executed Employment Agreements;

      (d)    a duly executed the Stockholders Agreement;

      (e)    certified copies of the Certificate of Incorporation and bylaws of Cambium;

      (f)    a copy of the resolutions of the Board of Directors of the Buyer, authorizing the execution and delivery of this Agreement and each of the other Related Agreements to which the Buyer is a party and the performance of the transactions contemplated hereby and thereby, certified by the Secretary of the Buyer;

      (g)    a certificate to the incumbency and signature of the officers of the Buyer executed by an officer or director of the Buyer and by another officer of the Buyer;

      (h)    a duly executed acknowledgement on behalf of Buyer of the Collateral Assignment of the Asset Purchase Agreement by the Company in favor of the Collateral Agent for the Mezzanine Lenders and any additional amounts to be paid at the Closing as provided on Schedule 1.3(b);

      (i)    a duly executed Trademark Assignment;

      (j)    duly executed Copyright Assignments;

      (k)    a duly executed Escrow Agreement; and

      (l)    a duly executed assignment of the GE Stop Loss Policy.

      8.4.   <u>Delivery of the Purchase Price</u>. The Buyer shall have delivered (i) the Equity Payment and the Closing Cash Payment to the Collateral Agent, (ii) the Escrow Amount to the Escrow Agent, (iii) the Murray Amount to Kathy Murray, (iv) the Chua Amount to Dennis Chua, (v) the Author Payment to the Authors and (vi) any additional amounts to be paid at the Closing as provided on Schedule 1.3(b).

80270310_11 (4).DOC

9.    Covenants of the Company and the Parent.

    9.1.    Cooperation.

    (a)    Subject to any limitations that are required to preserve any applicable attorney-client privilege, for a period of five (5) years from and after the Closing Date, each party agrees to furnish or cause to be furnished to the other parties, its counsel and accountants, upon reasonable request during normal business hours, after not less than three (3) business days prior written notice, such information and assistance relating to such party or its business (including, without limitation, the cooperation of officers and employees and reasonable access to books, records and other data and the right to make copies and extracts therefrom) as is reasonably necessary to: (i) facilitate the preparation for or the prosecution, defense or disposition of any suit, action, litigation or administrative, arbitration or other proceeding or investigation (other than one by or on behalf of one party to this Agreement against another party hereto); and (ii) prepare and file any other documents required by governmental or regulatory bodies. The party requesting such information and assistance shall reimburse the other party for all reasonable out-of-pocket costs and expenses incurred by such party in providing such information and assistance.

    (b)    the Buyer shall use commercially reasonable efforts to cooperate with the Seller to obtain the consents required by Section 7.1(q) and the releases required by Section 7.1(g) and (o).

    9.2.    Further Assurances.   Each of the parties agrees to work diligently, expeditiously and in good faith to consummate the transactions contemplated by this Agreement. From time to time after the Closing Date, the Parent and the Company shall execute and deliver to the Buyer such instruments of sale, transfer, conveyance, assignment, consent, assurance, power of attorney, and other such instruments as may be reasonably requested by the Buyer in order to vest in the Buyer all right, title and interest in and to the Acquired Assets and the Business and the parties hereto will execute and deliver such other instruments of sale, transfer, conveyance, assignment, assurance, power of attorney and other such instruments as may be reasonably required by the other parties hereto in order to carry out the purpose and intent of this Agreement and all other agreements to be executed in connection herewith. The Buyer and the Company shall each provide the other with such assistance as reasonably may be requested by the other in connection with the preparation of any tax return, an audit or examination of any such return by any taxing authority or any judicial or administrative proceeding relating to liability for taxes and shall each retain and provide the other with any records or other information which may be relevant to such a return, audit, examination or proceeding.

9.3    Company Health Plan.  Notwithstanding any other provision of this Agreement to the contrary, the Buyer shall assume the Company's self-insured group health plan (the "Health Plan"), subject to the condition that the stop-loss policy that has been purchased in connection with the Health Plan is effectively assigned to the Buyer and that the policy shall cover all claims in excess of the limits under such policy with respect to all claims incurred during the plan year ending December 31, 2003.  The foregoing shall not be read to prohibit the Buyer from amending or terminating the Health Plan at any time in its sole discretion.  This Section 9.3 shall not be construed to provide any rights to any third party (including without limitation any participant in the Health Plan) with respect to the Buyer or any affiliate thereof.

10.    Indemnification.

10.1.    Indemnification of the Buyer.  Subject to the terms of Section 10.6, each of the Parent and the Company, jointly and severally, shall indemnify and hold harmless the Buyer and its Affiliates in respect of any and all claims, losses, diminutions in value, damages, liabilities, whether or not currently due, and expenses (including, without limitation, settlement costs and any actual legal or other expenses for investigating or defending any actions or threatened actions) incurred by the Buyer or its Affiliates in connection with each and all of the following, together with interest on cash disbursements from the date of disbursement by the Buyer or its Affiliates in connection therewith at an interest rate that is equal to the average rate of return earned on the Escrow Amount for the period from the Closing Date until the Escrow Amount:

(a)    any misrepresentation made by the Company or the Parent in this Agreement (including any Schedules or Exhibits hereto) or any other document contemplated by this Agreement or breach of any warranty contained herein made by the Company or the Parent;

(b)    the breach of any covenant, agreement or obligation of the Company or the Parent contained in this Agreement or any other document contemplated by this Agreement;

(c)    any liabilities or obligations (continuing or otherwise) arising from the failure of the Buyer to obtain the protections afforded by compliance with the notification and other requirements of the bulk sales laws in force in the jurisdictions in which such laws may be applicable to the Company, the Business, the Acquired Assets or the transactions contemplated hereby;

(d)    any Excluded Liabilities;

(e)    any payments by the Buyer or any affiliate of Buyer under the Health Plan for claims incurred in the plan year ending December 31, 2003 in excess of $230,000 (regardless of when such claims are actually paid);

(f)    any liability arising from the Company's and/or the Parent's failure to obtain consents from publishers to the transfers of Intellectual Property contemplated by this Agreement; and

36

(g)   any liability arising out of the Company's or the Buyer's failure or inability to collect the amounts payable to the Business by Platform Learning under the terms and conditions of the purchase order from Platform Learning dated October 6, 2003 (the "Platform Learning Purchase Order") up to $387,500.

10.1.1. Limitations on Liability  The Buyer and its Affiliates shall only be entitled to recover under this Section 10 at such time and to the extent the aggregate amount of all Damages incurred by Buyer and its Affiliates exceeds $50,000.00, provided, however, that this limitation shall not apply to Sections 10.1(d), (e), (f) or (g).

10.2.   Survival.  Any claim for indemnification shall survive the Closing, subject to the time limitations set forth in this Section 10.2 with respect to certain of such claims.  Any claim for indemnification shall survive the applicable termination date if a party, prior to such termination date, shall have advised the other party in writing of facts that constitute or may give rise to an alleged claim for indemnification, specifying in reasonable detail the basis under this Agreement for such claim.

10.2.1. General Claims.  Any claim for indemnification hereunder other than a claim referred to in Section 10.1(e) or Section 10.2.2 shall be made during the period from the Closing Date until the first anniversary of the Closing Date.

10.2.2. Claims Barred Only by the Applicable Statute of Limitations.  Any claim based upon (a) any misrepresentation with respect to Sections 4.1, 4.2 or 4.6 ("Proper Authority Claim"); (b) any willful, grossly negligent, fraudulent or intentional misrepresentation of the Company or the Parent contained in this Agreement or any other document, list, exhibit or instrument furnished in connection herewith, including any assessment by a taxing authority alleged to arise from a willful, false or fraudulent intent to evade taxes, or from any failure to file a return ("Fraud Claim"); or (c) the failure of the Company to pay taxes for periods through and including the Closing Date or from a misrepresentation of the Company with respect to Section 4.4 ("Tax Claim"), may be made until 90 days after the expiration of the applicable statute of limitations.

10.2.3  Health Plan.  Any claim for indemnification under Section 10.1(e) shall be made during the period from the Closing Date to two (2) years after the Closing Date.

10.3.   Defense by the Indemnifying Party.  In connection with any claim giving rise to indemnity hereunder resulting from or arising out of any claim or legal proceeding by a person other than the indemnified party, the indemnifying party at its sole cost and expense may, upon written notice to the indemnified party received by the indemnified party within 10 calendar days after the indemnifying parties receipt of notice of such claim, assume the defense of any such claim or legal proceeding provided that the indemnifying party acknowledges its obligation to indemnify the indemnified party in respect of the entire amount of the claims asserted therein.  If the indemnifying party assumes the defense of any such claim or legal proceeding, the indemnifying party shall select counsel reasonably acceptable to the indemnified party to conduct the defense of such claims or legal proceedings and at its sole cost and expense shall take all steps necessary in the defense or settlement thereof.  The indemnifying party shall not consent to a settlement of, or the entry of any judgment arising from, any such claim or legal

proceeding, without the prior written consent of the indemnified party (which consent shall not be unreasonably withheld) unless the indemnifying party admits in writing its liability and agrees to hold the indemnified party harmless from and against any losses, damages, expenses and liabilities arising out of such settlement and concurrently with such settlement the indemnifying party pays into court the full amount of all losses, damages, expenses and liabilities to be paid by the indemnifying party in connection with such settlement. The indemnified party shall be entitled to participate in (but not control) the defense of any such action, with its own counsel and at its own expense and shall be entitled to any and all information and documentation relating thereto. If the indemnifying party does not assume (or continue to diligently and competently prosecute) the defense of any such claim or litigation resulting therefrom in accordance with the terms hereof, the indemnified party may defend against such claim or litigation in such manner as it may deem appropriate, including, but not limited to, settling such claim or litigation, after giving notice of the same to the indemnifying party, on such terms as the indemnified party may deem appropriate. In any action by the indemnified party seeking indemnification from the indemnifying party in accordance with the provisions of this Section 10, the indemnifying party shall not be entitled to question the manner in which the indemnified party defended such claim or litigation or the amount of or nature of any such settlement; provided that such limitations shall not apply to claims of fraud, bad faith, gross negligence or willful misconduct by the indemnified party.

      10.4. <u>Notice</u>. The parties hereto agree that in the event of any occurrence which may give rise to a claim by an indemnified party hereunder the indemnified party will give prompt notice thereof to the indemnifying party; provided, however that failure to timely give the notice provided in this Section shall not be a defense to the liability of the indemnifying party for such claim, but the indemnifying party may recover any actual damages arising from the indemnified party's failure to give such timely notice.

      10.5. <u>Waiver</u>. The indemnified party agrees that it will not waive any statute of limitations or defense that would increase the liability of the indemnifying party hereunder without (except in connection with pending litigation in which the indemnifying party has not assumed the defense) the consent of the indemnifying party.

      10.6. <u>Indemnification Escrow Amount</u>. All claims for indemnification made by or for an indemnified party pursuant to this Section 10 shall be limited to, and shall be satisfied solely from, the Indemnification Escrow Amount under the Escrow Agreement and the right to indemnification set forth in this Section 10 shall be the sole and exclusive legal remedy following the Closing Date for any breaches of the representations, warranties, covenants and agreements under this Agreement. Notwithstanding the immediately preceding sentence, nothing in this Agreement shall limit the liability of any Person resulting from fraud or willful misconduct in connection with this Agreement or the transactions contemplated hereby. Any payment made to an indemnified party from the Escrow Amount to satisfy a claim for indemnification pursuant to this Section 10 shall be treated as an adjustment to the Purchase Price. In the event that the Buyer has not received payment in full of the amounts receivable under the Platform Learning Purchase Order by October 28, 2004, the Buyer and the Company shall instruct the Escrow Agent to release and pay to the Buyer any such unpaid amount up to $387,500 plus any recovery costs incurred by the Buyer; <u>provided</u>, <u>however</u>, that the Buyer and the Company shall instruct the Escrow Agent to release and pay to the Collateral Agent on a

weekly basis 50% of any amounts received from Platform Learning arising out of the Platform Learning Purchase Order (net of 50% of any costs of recovery) for that week up to $387,500 in the aggregate for all such payments to the Collateral Agent. To the extent that there (a) are no outstanding claims against the Escrow Amount, or (b) are claims outstanding against the Escrow Amount, that, together with the reasonably anticipatable fees and expenses of resolving such claims, are in aggregate less than the balance of the Escrow Amount on the first anniversary of this Agreement (the "Available Excess"), then the balance of the Escrow Amount (in the event of subsection (a) or the Available Excess (in the event of subsection (b)) shall be promptly released and delivered to the Company; provided, however, that an amount of funds estimated by the Buyer in good faith to cover any claims for indemnification under Section 10.1(e) above to be incurred from and after the first anniversary of the date of this Agreement and on or prior to the date that is two (2) years after the Closing Date shall remain in the Escrow Amount until two (2) years after the Closing Date (or, if earlier, until paid to the Buyer pursuant to the provisions hereof).

11.    Miscellaneous Provisions.

11.1.    Jurisdiction; Agent for Service. Legal proceedings commenced by the Parent, the Company or the Buyer arising out of any of the transactions or obligations contemplated by this Agreement shall be brought exclusively in the federal courts, or in the absence of federal jurisdiction in state courts, in either case in the State of New York. The Buyer, the Company and the Parent irrevocably and unconditionally submit to the jurisdiction of such courts and agree to take any and all future action necessary to submit to the jurisdiction of such courts. The Buyer, the Company and the Parent irrevocably waive any objection that they now have or hereafter may have to the laying of venue of any suit, action or proceeding brought in any such court and further irrevocably waive any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum. Final judgment against the Buyer, the Company or the Parent in any such suit shall be conclusive and may be enforced in other jurisdictions by suit on the judgment, a certified or true copy of which shall be conclusive evidence of the fact and the amount of any indebtedness or liability of the Buyer, the Company or the Parent therein described, or by appropriate proceedings under any applicable treaty or otherwise.

11.2.    Construction. This Agreement shall be construed and enforced in accordance with and governed by the internal laws of the State of New York.

11.3.    Notices. All notices, requests, demands and other communications called for or contemplated hereunder shall be in writing and shall be deemed to have been duly given when delivered to the party to whom addressed or when sent by telegram, telex or wire (if promptly confirmed by registered or certified mail, return receipt requested, prepaid and addressed) to the parties, their successors in interest, or their assignees at the following addresses, or at such other addresses as the parties may designate by written notice in the manner aforesaid:

| | |
|---|---|
| If to the Buyer: | c/o EdNewco, LLC<br>44 Carisbrooke Road<br>Wellesley, MA 02481<br>Attention: Mr. Nader Darehshori<br>Tel: 781-235-5554<br>Fax: 781-235-2661 |
| With a copy to: | Whitney & Co., LLC<br>177 Broad Street<br>Stamford, Connecticut 06901<br>Attention: Mr. Daniel J. O'Brien<br>Tel: 203-973-1400<br>Fax: 203-973-1422 |
| | Gibson, Dunn & Crutcher LLP<br>200 Park Avenue<br>New York, New York 10166<br>Attention: Mr. William M. Rustum, Esq.<br>Tel: 212-351-4000<br>Fax: 212-351-4035 |
| If to the Company<br>or the Parent: | c/o Mr. Reginald Powe<br>Metropolitan Teaching and Learning Co., Inc.<br>33 Irving Place<br>New York, NY 10003<br>Attention: Mr. Reginald L. Powe<br>Tel: 212-475-8826<br>Fax: 212-475-8311 |
| | BOCNY, LLC<br>c/o Stonehenge Capital Corporation<br>152 W. 57th Street, 20th Floor<br>New York, NY 10019<br>Attention: W. Stephen Keller<br>Tel: 212-944-2542<br>Fax: 212-656-1344 |

With a copy to:                    Pedley, Zielke, Gordinier & Pence, PLLC
                                   2000 Meidinger Tower
                                   462 South 4th Avenue
                                   Louisville, Kentucky  40202
                                   Attention:  Mr. David M. Pedley, Esq.
                                   Tel:    502-214-3141
                                   Fax:    502-584-0422

     11.4.    <u>Payment of Expenses</u>.  The Company and the Parent shall pay any and all taxes arising out of the acquisition of the Business, transfer of the Acquired Assets and the assumption of the Assumed Liabilities.  Except as expressly provided to the contrary in this Agreement, the Buyer shall bear its costs and expenses and the Company and the Parent shall bear their costs and expenses (including, without limitation, legal fees and expenses) incurred in negotiating, closing and carrying out the transactions contemplated by this Agreement.  Real estate, business property and personal property taxes, rentals, payments, receipts and other fees and costs relating to the use of the Acquired Assets shall be prorated between the Company and the Buyer as of the Closing Date.

     11.5.    <u>Assignment</u>.  Neither this Agreement nor any right, remedy, obligation or liability arising hereunder or by reason hereof nor any of the documents executed in connection herewith may be assigned by either party without the consent of the other party hereto except that the Buyer shall have the right to assign all of its rights and obligations under this Agreement to any of its Affiliates if such transferee corporation agrees to assume all of Buyer's obligations under this Agreement, provided that such transfer shall not discharge the Buyer from its obligation herewith unless the Company consents to such discharge, which consent shall not be unreasonably withheld.  Nothing contained herein, expressed or implied, is intended to confer upon any person or entity other than the parties hereto and their successors in interest and permitted assignees any rights or remedies under or by reason of this Agreement unless so stated herein to the contrary.

     11.6.    <u>Amendments and Waiver</u>.  This Agreement and all exhibits and schedules hereto set forth the entire understanding of the parties and may be modified only by a written instrument duly executed by each party.  Except as herein expressly provided to the contrary, no breach of any covenant, agreement, warranty or representation shall be deemed waived unless expressly waived in writing by the party who might assert such breach.

     11.7.    <u>Survival</u>.  The covenants, agreements, warranties and representations entered into or made pursuant to this Agreement, irrespective of any investigation made by or on behalf of any party, shall be continuing and shall survive the Closing Date for a period through and including the last day upon which the Buyer may seek indemnification for a breach of such covenant, agreement, warranty or representation under Section 10.

     11.8.    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.

11.9.  Headings.  Headings in this Agreement are for reference purposes only and shall not be deemed to have any substantive effect.

11.10.  Attorneys' Fees.  In the event that any action or proceeding, including arbitration, is commenced by any party hereto for the purpose of enforcing any provision of this Agreement, the parties to such action, proceeding or arbitration may receive as part of any award, judgment, decision or other resolution of such action, proceeding or arbitration their costs and reasonable attorneys' fees as determined by the person or body making such award, judgment, decision or resolution.  Should any claim hereunder be settled short of the commencement of any such action or proceeding, including arbitration, the parties in such settlement shall be entitled to include as part of the damages alleged to have been incurred reasonable costs of attorneys or other professionals in investigating or counseling on such claim.

11.11.  Binding Nature of Agreement.  All of the terms and provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective executors, heirs, legal representations, successors and permitted assigns.

11.12.  Severability.

(a)  Any provision of this Agreement which is invalid, illegal or unenforceable in any jurisdiction will, as to that jurisdiction, be ineffective to the extent of such invalidity, illegality, or unenforceability, without affecting in any way the remaining provisions hereof in such jurisdiction or rendering that or any other provision of this Agreement invalid, illegal or unenforceable in any other jurisdiction.

(b)  If a court competent jurisdiction determines that the character, duration or geographical scope of the provisions of Section 6 hereof are unreasonable, then it is the intention and the agreement of the parties hereto that the provisions of Section 6 shall be construed by the court in such a manner as to impose only those restrictions on the Parent's and the Company's conduct that are reasonable in light of the circumstances and as are necessary to assure to the Buyer the benefits of this Agreement. If, in any judicial proceeding, a court shall refuse to enforce all of the separate covenants deemed included herein because taken together they are more extensive than necessary to assure to the Buyer the intended benefits of this Agreement, it is expressly understood and agreed by the parties hereto that the provisions of Section 6 hereof that, if eliminated, would permit the remaining separate provisions to be enforced in such proceeding, shall be deemed eliminated, for the purposes of such proceeding, from this Agreement.

11.13.  Specific Performance.  The Company and the Parent acknowledge that Buyer will have no adequate remedy at law and may suffer irreparable damage if the Company and the Parent breach any covenant contained in Section 6 hereof.  Accordingly, the Company and the Parent agree that the Buyer shall have the right, in addition to any other rights which it may have, to specific performance and equitable injunctive relief if the Company and the Parent shall fail or threaten to fail to perform any of their obligations under Section 6 of this Agreement.

11.14.  Complete Agreement.  This Agreement, the Exhibits and Schedules hereto and the documents delivered or to be delivered pursuant to this Agreement contain or will

42

contain the entire agreement between the parties hereto with respect to the transactions contemplated herein and shall supersede all previous oral and written and all contemporaneous oral negotiations, commitments, and understandings.  The Schedules and Exhibits hereto are incorporated by reference.

11.15.  <u>Knowledge of the Company</u>.  With respect to any representation, warranty or statement contained in this Agreement that is made to the knowledge of the Company or the Parent, it is expressly understood and agreed that such knowledge shall include the knowledge of Reginald L. Powe, Colleen Jones, Dennis Chua, Douglas Nash, Mary Keller, Jack Beers and Helen Breen.

11.16.  <u>Drafting Presumption</u>.  The parties hereto agree that they participated in the drafting of this Agreement and, in the event that any dispute arises in the interpretation or construction of this agreement, no presumption shall arise that any one party drafted this Agreement.

(The remainder of this page is left blank intentionally)

43

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on date first written above.

CAMBIUM LEARNING (NEW YORK), INC.

By: _____
    Name: DAVID CAPPELLUCCI
    Title: EXECUTIVE VICE PRESIDENT

CAMBIUM LEARNING, INC.

By: _____
    Name: DAVID CAPPELLUCCI
    Title: EXECUTIVE VICE PRESIDENT

METROPOLITAN TEACHING AND LEARNING CO., INC.

By: _____
    Name:
    Title:

METROPOLITAN T.L.C. HOLDINGS, INC.

By: _____
    Name:
    Title:

DIALOGUE SYSTEMS, INC.

By: _____
    Name:
    Title:

AMERICAN TEACHER PUBLICATIONS, INC.

By: _____
    Name:
    Title:

[SIGNATURE PAGE TO AGREEMENT OF PURCHASE AND SALE OF ASSETS]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date first written above.

CAMBIUM LEARNING (NEW YORK), INC.

By: _____
    Name:
    Title:

CAMBIUM LEARNING, INC.

By: _____
    Name:
    Title:

METROPOLITAN TEACHING AND LEARNING CO., INC.

By: _____
    Name: Reginald L. Powe
    Title: C.E.O.

METROPOLITAN T.L.C. HOLDINGS, INC.

By: _____
    Name: Reginald L. Powe
    Title: C.E.O.

DIALOGUE SYSTEMS, INC.

By: _____
    Name: Reginald L. Powe
    Title: C.E.O.

AMERICAN TEACHER PUBLICATIONS, INC.

By: _____
    Name: Reginald L. Powe
    Title: C.E.O.

[SIGNATURE PAGE TO AGREEMENT OF PURCHASE AND SALE OF ASSETS]